[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14110

_____

Agency No. A215-660-467


LUIS MIGUEL CABRERA MARTINEZ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(April 7, 2021)

Before MARTIN, NEWSOM, and BRANCH, Circuit Judges.

BRANCH, Circuit Judge:

Cuban citizen Luis Miguel Cabrera Martinez petitions for review of the

Board of Immigration Appeals's ("BIA") order affirming the denial of his

applications for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). The BIA affirmed the immigration judge's ("IJ") findings that: (1) Martinez failed to establish that he suffered past persecution; (2) Martinez failed to establish that he had a well-founded fear of future persecution in Cuba as a dissident journalist; and (3) Martinez failed to establish that he was likely to be tortured if he returned to Cuba. Because the IJ and the BIA failed to provide reasoned consideration of Martinez's evidence of his well-founded fear of future persecution based on a pattern or practice of persecution toward dissident journalists in Cuba, we grant in part his petition, vacate the BIA's decision in part, and remand this case for further proceedings. We deny, however, Martinez's petition for review of his asylum claim based on past persecution because substantial evidence supports the BIA's conclusion that Martinez did not demonstrate that he suffered past persecution.

## I.    Background

### A. Martinez's Application & Hearing

In his application for asylum, withholding of removal, and CAT relief, Martinez alleged that Cuban officials targeted him for mistreatment after they learned of his writing for *Convivencia*, a magazine critical of Cuban tax policies.

2

Although Martinez used a pseudonym for his writings, he asserted that Cuban officials became aware of his affiliation with the magazine because he attended weekly meetings at the home of the magazine director.

During his hearing on his application, Martinez testified that he was harmed or threatened "on multiple occasions" by Cuban officials, and he described a series of incidents that occurred over a two-year period that he attributed to writing for *Convivencia*.

Specifically, in July 2015, his mother's coworkers warned her about Martinez's collaboration with the magazine. Then, in November 2015, the president of the Committees for the Defense of the Revolution ("CDR"), a neighborhood group of Cuban government informants, warned Martinez that if he continued "writing for the magazine" or "helping in these manifestations" that he could "spend a lot of time in prison," "be tortured," and that the CDR could "do unimaginable things to [him]." Martinez later received notes from a different CDR member warning that he should not participate in further activities supporting *Convivencia*.

On February 13, 2016, two men wearing "regular civilian clothes" stopped Martinez and asked for his identification. When Martinez asked the two men— who onlookers later told Martinez were "agents of the communist security"—to identify themselves first, the men began hitting Martinez. The last hit was to

3

Martinez's head which caused him to fall, lose consciousness for a few minutes, and created a laceration that his mother, a nurse, treated at their home.

On July 25, 2016, two officers "from the regime" arrested Martinez at his house and detained him for approximately 20 hours. Martinez testified that the officers put him in a dank cell at the police station and interrogated him for hours about "what [they] were working on in the magazine," future "projects," and whether the magazine had any planned "marches." When Martinez refused to answer questions, the interrogators laughed and stated that he "could be tortured," "jailed," or "they could make [him] disappear," but they released him the next day, and he was not physically harmed. Martinez explained that he believed he was released because his family had contacted a human rights organization which put "pressure" on the police to release him.

Martinez's job as a waiter was his primary source of income.[1] Martinez asserted that, in December 2016, the "communists" also went to the owner of the café where Martinez worked and told the owner he needed to fire Martinez, and the owner did in fact fire him. Martinez testified that, this scenario occurred "[a]round two [other] times" after restaurant owners received the same "warnings."

---

[1] Martinez also testified that he had been a physical education teacher "way before [he] worked as a waiter."

Martinez then moved south of his hometown, Pinar Del Rio, to a different town. On January 28, 2017, officers "from the regime" detained Martinez for 72 hours and questioned him about his "objective in th[e] town, who were [his] friends . . . , [and] what type of activities [he was] going to be doing." Martinez was released after 72 hours without incident, but the officers told him that he needed to leave the town because he was "known to have political problems in [his] [home]town."

Martinez then returned to his hometown and ultimately decided to leave Cuba, but officials delayed his travel. Specifically, on April 4, 2017, after Martinez checked in for a flight to Guyana, "immigration agents" detained him briefly to determine whether he had "classified information" about Cuba and whether he posed a "national security threat." The agents confiscated his cell phone and laptop computer and then released him.

On August 8, 2017, a person in passport control at the airport helped Martinez leave Cuba using his own passport, and he flew to Guyana. After traveling through various parts of South and Central America, Martinez arrived in the United States over a year later on September 4, 2018.

Yoan Miguel Carballea Veliz, Martinez's asylum sponsor, also testified at the asylum hearing. Veliz stated that he visited Cuba and Martinez's family on July 25, 2016, and was shocked to see that the president of the CDR and the police

were "controlling everything."  During his last trip to Cuba, Martinez's mother told Veliz that she was "nervous" because officials were "surveilling her."  While Veliz was visiting the Martinez family, he observed the police "just like arresting people" and officers "yell[] at" and push Martinez's mother.

In support of his application, Martinez also submitted country reports on Cuba from the U.S. State Department and Human Rights Watch.  The State Department report stated that "[t]he most significant human rights issues included torture of perceived political opponents" and that "independent journalists" in Cuba "sometimes faced government harassment, including detention and physical abuse."  The Human Rights Watch report stated that "[i]ndependent journalists who publish information considered critical of the government are subject to harassment, smear campaigns, raids on their homes and offices, confiscation of their working materials, and arbitrary arrests."  It also said "[t]he government continues to use other repressive tactics, including beatings, public shaming, travel restrictions, and termination of employment against critics."  Martinez also submitted a British Broadcasting Corporation profile, which said that Cuba had "the most repressive media environment in the Americas."

## B. Immigration Judge's Findings

The IJ found Martinez's testimony credible but denied Martinez's applications for relief.  The IJ found that Martinez had not met his burden of

6

proving past persecution because the incidents he described collectively "[did] not rise to the level of harm required for persecution."  The IJ emphasized that "mere harassment and intimidation" is insufficient to establish persecution, and the incidents Martinez described did not constitute the type of severe mistreatment that has been found to rise to the level of persecution.

The IJ rejected as objectively unreasonable Martinez's fear of future persecution because the evidence did not suggest he "would be singled out for persecution" because Cuban officials were not searching for him, issued no warrant for his arrest, released him twice without injury and charges, and his family continued to reside in their hometown unharmed.

The IJ also rejected as unfounded Martinez's fear of future persecution based on Cuban officials' pattern or practice of oppressing dissident journalists. The IJ acknowledged, based on the country reports Martinez submitted, the "severe political oppression committed by the Cuban government."  But the IJ concluded that the government oppression was "mainly aimed" at specific groups like "opposition party . . . journalists," and Martinez had provided "no evidence that the Cuban government recognizes him as an opposition party journalist."  The IJ found that Martinez was not considered a "member of the media" because he wrote using a pseudonym and his visits to the magazine director's home "indicate[d] [he] was [the director's] friend . . . or a supporter of the magazine, not that he actively wrote

7

magazine articles." Accordingly, because Martinez failed to establish either past persecution or a well-founded fear of future persecution, the IJ denied his asylum claim.

Further, because Martinez could not "satisfy the lower burden of proof for asylum," the IJ found that he "fail[ed] to qualify for withholding of removal." Finally, the IJ found that Martinez did not qualify for CAT relief because, in the absence of past persecution or torture, he was unlikely to be tortured "by or at the instigation of, or with the consent or acquiescence of" a Cuban official.

## C. BIA Opinion

The BIA dismissed Martinez's appeal on his claims for asylum, withholding of removal, and CAT relief. As to past persecution, the BIA recounted the series of incidents Martinez testified to, emphasized that the BIA considered these incidents cumulatively, but concluded that Martinez's "verbal and physical mistreatment, although disturbing, [did] not cumulatively rise in severity to the level of past persecution." It found that the officers' threat to make Martinez "disappear" was vague, conditional, and not a "credible death threat by a person who has the immediate ability to act on it."

The BIA also agreed that Martinez lacked a well-founded fear of future persecution, adopted the immigration judge's analysis of that issue, and found that the evidence of general political conditions in the country reports was insufficient

8

to prove that Martinez would be persecuted.  The BIA further concluded that Martinez was not entitled to CAT relief because his claim was "based on the same facts and fears" as his unsuccessful asylum claim.  Martinez appealed.

## II.     Standard of Review

"We review the decision of the [BIA] and the decision of the [IJ] to the extent that the [BIA] expressly adopted the opinion of the [IJ]." *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947–48 (11th Cir. 2010) (quoting *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009)).  Although we review legal issues *de novo*, our review of the BIA's factual findings is "limited" by "the highly deferential substantial evidence test," under which we must affirm the decision of the BIA so long as the decision "is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1236 (11th Cir. 2006) (quotation omitted).  Under the substantial evidence test, we review the evidence in the light most favorable to the BIA's decision and "draw all reasonable inferences in favor of that decision." *Id.* Findings of fact may be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *Id.* (quoting *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (*en banc*)).

9

## III.    Discussion

Martinez argues that he presented ample evidence that demonstrated his eligibility for asylum, which he contends also established his eligibility for withholding of removal and CAT relief.[2]  To qualify for asylum, Martinez must present specific, credible evidence that establishes that he is a "refugee"[3] by showing either (1) that he was persecuted in the past "on account of" his "membership in a particular social group," or (2) that he has a "well-founded fear" of future persecution "on account of" his membership in a particular social group.

---

[2]  To qualify for withholding of removal under the INA, an applicant must demonstrate that, if removed to his country, his "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3).  He must show that it is "more likely than not" that he will be persecuted or tortured upon returning to his country to prevail on his withholding of removal claim.  *Carrizo v. U.S. Att'y Gen.*, 652 F.3d 1326, 1331 (11th Cir. 2011) (quotation omitted).

To qualify for CAT relief, an applicant must show that he will more likely than not be tortured if removed to his country of removal by or at the instigation of, or with the consent or acquiescence of, a public official or other person acting in an official capacity.  8 C.F.R. §§ 208.16(c)(2), 208.18(a)(1).

Generally, if an applicant is unable to meet the standard of proof for asylum, he will be precluded from qualifying for withholding of removal and relief under the CAT.  *Forgue v. U.S. Atty. Gen.*, 401 F.3d 1282, 1288 (11th Cir. 2005) (holding that because the applicant "failed to establish a claim of asylum on the merits, he necessarily fails to establish eligibility for withholding of removal or protection under CAT").

[3]  The term "refugee," is defined, in part, as:

[A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A)

10

*See Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1232 (11th Cir. 2007); *see also* 8 U.S.C. § 1158(b)(1) (listing conditions for granting asylum).[4]

Persecution is an "extreme concept" requiring evidence of "more than a few isolated incidents of verbal harassment or intimidation." *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1231 (11th Cir. 2005). In considering evidence of persecution, we "must consider the cumulative effect of the allegedly persecutory incidents." *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1008 (11th Cir. 2008); *Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253, 1258 (11th Cir. 2007).

### A. Past Persecution

"To establish asylum based on past persecution, the applicant must prove (1) that [he] was persecuted, and (2) that the persecution was on account of a protected ground." *Sanchez Jimenez*, 492 F.3d at 1232 (quoting *Silva*, 448 F.3d at 1236). A showing of past persecution creates a rebuttable presumption of a well-founded fear of future persecution. *Id.*

Martinez argues that he provided sufficient evidence of past persecution on account of the Cuban government's identification of him as a dissident journalist based on the facts that he was: (1) beaten by two plain-clothes "officers" that left

[4] An applicant seeking asylum has the burden to prove he is a "refugee" as defined by 8 U.S.C. § 1101(a)(42)(A). To meet that burden, "the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C.A. § 1158(b)(1)(B)(i).

11

him briefly unconscious and with a cut on his head that his mother stitched up at home; (2) threatened by the head of the CDR that if he continued writing for *Convivencia* he could be imprisoned, tortured, and that the CDR could "do unimaginable things to [him]"; (3) seized by Cuban officials from his home, detained overnight, interrogated about his work with *Convivencia*, and threatened that he "could be tortured," "jailed," or they could "they could make [him] disappear"; (4) fired from three jobs as a waiter after government officials threatened the business owners; (5) arrested, detained for three days, and kicked out of a different town due to "political problems in [his] [home]town"; and (6) required to give his laptop and cell phone to government officials and stopped from leaving the country when he tried to fly to Guyana. Martinez argues that the BIA erred in denying his past persecution claim based on this evidence because the BIA failed to consider his mistreatment cumulatively and focused on his lack of severe physical injuries.

Although Martinez did testify credibly to this mistreatment, we cannot disturb the BIA's factual finding that this treatment did not rise to the level of persecution unless "the evidence presented by [Martinez] is so powerful that a reasonable factfinder would *have* to conclude that the requisite fear of persecution exists." *Mazariegos v. Office of U.S. Att'y Gen.*, 241 F.3d 1320, 1323–24 (11th Cir. 2001). After careful review, we hold that the evidence Martinez presented

12

does not rise to the level of compelling a reversal here.  Rather, viewing the evidence in the light most favorable to the BIA's decision and "draw[ing] all reasonable inferences in favor of that decision," as we are required to do, we conclude that substantial evidence supports the BIA's finding that these incidents considered cumulatively were not "sufficiently extreme to constitute persecution." *De Santamaria*, 525 F.3d at 1009.

It is undisputed that Martinez did not suffer any significant or severe physical injuries as a result of the various incidents of mistreatment in Cuba.[5]  The lack of a severe physical injury, however, does not preclude Martinez's past persecution claim.  Rather, past persecution may be found absent a serious physical injury when the applicant demonstrates repeated threats combined with other forms of severe mistreatment.  *Id.* (concluding that an applicant established past persecution when she suffered repeated death threats, two physical attacks which resulted in minor physical injuries, the murder of a family friend who would not give up her whereabouts, and "a kidnapping cut short only by a harrowing escape"); *Mejia*, 498 F.3d at 1257–58 (holding that multiple verbal death threats and attempted attacks over an 18-month period, combined with a roadside assault

---

[5]  Although Martinez received a minor head wound when he was beaten by the two plainclothes officers, his mother was able to treat the wound at home.

at gunpoint where the alien was thrown to the ground and hit in the face with the gun, resulting in a broken nose, amounted to persecution).

Substantial evidence supports the BIA's conclusion that the cumulative mistreatment to which Martinez testified did not rise to the level of severe mistreatment for purposes of establishing persecution. For instance, the warnings that Martinez received from the president of the CDR and a local official that he could be imprisoned, tortured, or "made to disappear" for his "writing" and "activities supporting the magazine" while harassing, did not rise to the level of "severe mistreatment." Officials intimidated Martinez by detaining him, questioning him, and releasing him without harm. *See Kazemzadeh*, 577 F.3d at 1347, 1352–53 (holding that an applicant's treatment did not compel a finding of past persecution when he was imprisoned for four days, interrogated and beaten for five hours, and questioned and monitored after his release). And the BIA was entitled to find that the officer's threat that they could make Martinez "disappear" during his first detention was menacing, but not persecution. *Compare Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2003) (holding that unfulfilled threats constituted harassment rather than persecution), *with Diallo v. U.S. Att'y Gen.*, 596 F.3d 1329, 1331–34 (11th Cir. 2010) (holding that an applicant who was told he would be executed the next day by the same soldiers who had just killed his

14

brother and avoided the threat only by escaping confinement established persecution).

Martinez also testified that he was fired from restaurants in December 2016 in his hometown and was kicked out of a new town in January 2017 because of his political activities. But "employment discrimination which stops short of depriving an individual of a means of earning a living does not constitute persecution." *Barreto-Claro v. U.S. Att'y Gen.*, 275 F.3d 1334, 1340 (11th Cir. 2001). The record established that Martinez was still writing for the magazine and that he had previous experience as a physical education teacher. Martinez—who again bore the burden of establishing eligibility for asylum based on past persecution—offered no evidence that he was unable to find work in his hometown in a different field or that he continued searching for a job after the two-month period between December 2016 and January 2017. The record also does not reveal whether Martinez lacked a source of income until he left Cuba in August 2017. Thus, the evidence of Martinez's economic mistreatment does not compel a finding of persecution. *See Zheng* v. *U.S. Att'y Gen.*, 451 F.3d 1287, 1291 (11th Cir. 2006) (per curiam) (holding that an applicant's termination and inability to find work in his hometown was insufficient to compel a finding of past persecution because the applicant did not demonstrate "how long he searched for a job" and the

15

evidence was otherwise insufficient to demonstrate "he was deprived of all means of earning a living").

Similarly, the fact that in April 2017 government officials stopped Martinez from flying to Guyana by briefly detaining him and seizing his laptop and cell phone is insufficient to compel a finding of persecution. Although the government's actions were harassing, they do not compel a finding of persecution. *Zheng*, 451 F.3d at 1290–91.

In sum, Martinez's combined experiences with Cuban officials, though certainly harassing and intimidating, do not rise to the level of the brutal harms suffered by the applicants in cases when we have overturned a BIA's decision under the substantial evidence standard. *See De Santamaria*, 525 F.3d 999; *Diallo*, 596 F.3d 1329; *Mejia*, 498 F.3d 1253. Accordingly, the record does not compel the finding that Martinez suffered past persecution.

## B. Well-Founded Fear of Future Persecution

"To establish eligibility for asylum based on a well-founded fear of future persecution, the applicant must prove (1) a subjectively genuine and objectively reasonable fear of persecution that is (2) on account of a protected ground." *Sanchez Jimenez*, 492 F.3d at 1232 (quoting *Silva*, 448 F.3d at 1236). "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution. In most cases, the objective prong can

16

be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." *Id.* (quotations and internal citation omitted); *see also* 8 C.F.R. § 208.13(b)(2)(i). To demonstrate a well-founded fear of future persecution, the applicant can show that he would be singled out for persecution if returned to his country or "that there is a pattern or practice in his country . . . of persecution of a group of persons similarly situated to the applicant on account of" a protected ground. 8 C.F.R. § 208.13(b)(2)(iii).

Because he did not demonstrate past persecution, Martinez is not entitled to a presumption of future persecution. *Sanchez Jimenez*, 492 F.3d at 1232. Martinez argues that he demonstrated a well-founded fear of future persecution because he is a member of a particular social group—dissident journalists—subjected to a pattern or practice of persecution in Cuba.[6] In support of his claim, he points to the country reports he submitted detailing Cuba's oppressive media environment and the harassment, detentions, and physical abuse dissident journalists face in Cuba. And in support of his claim that Cuba identified him as such a journalist, such that his fear of persecution if returned to Cuba is objectively reasonable, Martinez

---

[6] The government argues that Martinez's "pattern or practice" argument for future persecution is "questionably before this Court as both unexhausted and waived" because Martinez raised it only in a "perfunctory" manner both before the BIA and in his brief in this Court. We disagree. After reviewing the record, it is clear that Martinez adequately raised the argument that the Cuban government targets dissident journalists before the immigration judge, the BIA, and our court.

17

points to the fact that the President of the CDR in his hometown threatened him if he continued "writing for the magazine" and that the officers who detained him in July 2016 asked him about projects the magazine was working on and any planned "marches."

The BIA and the immigration judge were required to give Martinez's evidence of his fear of future persecution reasoned consideration. *Ali v. U.S. Att'y Gen.*, 931 F.3d 1327, 1333 (11th Cir. 2019). To meet this obligation, the BIA "does not need to do much." *Id.* Although the BIA's decision did not have to address each piece of evidence presented, it had to "consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted" to the issues raised and evidence presented. *Kazemzadeh*, 577 F.3d at 1351 (quotation omitted). We have found a lack of reasoned consideration in three types of circumstances—when the BIA: (1) "misstates the contents of the record," (2) "fails to adequately explain its rejection of logical conclusions," or (3) "provides justifications for its decision which are unreasonable and which do not respond to any arguments in the record." *Ali*, 931 F.3d at 1334 (quoting *Jeune v. U.S. Att'y Gen*, 810 F.3d 792, 803 (11th Cir. 2016)). Thus, all three circumstances "share a common trait: The [BIA's] opinion, read alongside the evidentiary record, forces us to doubt whether we and the [BIA] are, in substance, looking at the same case." *Id.*

18

Although reasoned consideration is not a demanding standard, the IJ, whose analysis the BIA expressly adopted, demonstrated that it did not give adequate consideration to Martinez's fear of future persecution based on a pattern or practice claim because it plainly misstated the record evidence crucial to Martinez's argument.

The IJ acknowledged that, based on the country reports Martinez submitted, there existed a pattern or practice "of severe political oppression . . . by the Cuban government . . . aimed at opposition party . . . journalists."  But the IJ implied that this evidence did not help Martinez's case because Martinez "provided no evidence that the Cuban government recognizes him as an opposition party journalist."  The BIA expressly adopted this reasoning.[7]  But the IJ and the BIA overlooked Martinez's testimony that established that Cuban officials considered Martinez a writer—not just a political supporter—of the magazine *Convivencia*.  Specifically, Martinez testified that before the majority of his mistreatment by Cuban officials, the president of the CDR warned Martinez to stop "writing" for the magazine. Such testimony is critical to the determination of whether there is a reasonable possibility that Martinez is a member of a group that Cuba has a pattern or practice of persecuting on account of political opinion.

---

[7] The BIA stated in its opinion that it "agree[d] that the respondent has not shown a reasonable possibility of future persecution on account of his political opinion in Cuba, for the reasons stated in the [IJ's] decision."

19

The IJ and BIA's failure to give reasoned consideration to Martinez's claim of a well-founded fear of future persecution requires us to grant his petition in part, vacate the decision of the BIA, and remand the case for further proceedings. *Ali*, 931 F.3d at 1336.

## IV. Conclusion

Substantial evidence supports the BIA's conclusion that Martinez did not demonstrate that he is entitled to asylum based on a showing of past persecution. But because the BIA failed to provide reasoned consideration to Martinez's evidence of his fear of future persecution, we vacate the BIA's decision and remand for further consideration of whether Martinez demonstrated his eligibility for asylum based on his pattern or practice claim. Further, because the BIA based its denial of Martinez's claims for withholding of removal under the INA and CAT relief on its denial of Martinez's asylum claim, we remand those claims for further consideration as well.[8]

**PETITION GRANTED IN PART AND DENIED IN PART; VACATED AND REMANDED.**

---

[8] Although the BIA opinion did not separately address Martinez's withholding of removal claim, it dismissed Martinez's appeal on withholding of removal and affirmed the IJ's decision that Martinez was not entitled to withholding of removal because he failed to satisfy the burden of proof for asylum. Similarly, as to Martinez's CAT claim, the BIA denied Martinez's requested relief because his CAT claims was "based on the same facts and fears as his asylum claim." Accordingly, we leave these claims for the BIA to consider on remand after the BIA reconsiders Martinez's asylum claim.

MARTIN, Circuit Judge, concurring in part and dissenting in part:

Mr. Martinez has made the case that he suffered two years of threats and abuse at the hands of the Cuban government because he is a journalist for a dissident magazine (Convivencia) that is critical of the government. Although the immigration officials who heard Mr. Martinez's account found him to be credible, they gave him no relief. The Board of Immigration Appeals (BIA) said Mr. Martinez must be returned to Cuba because the story he truthfully told did not sufficiently show either that he had been persecuted in the past, or that he had a well-founded fear of being persecuted in Cuba in the future.

Now the majority opinion gives Mr. Martinez relief on one of the grounds rejected by the immigration authorities, but not the other. Maj. Op. at 2. The majority says the BIA failed to give reasoned consideration to Mr. Martinez's claim that he has a well-founded fear of future persecution. See id. at 16–20. I agree and join in that part of the opinion. However, I would give Mr. Martinez broader relief because I think Martinez's experiences as he tried to live and work in Cuba show that he suffered past persecution as well. I therefore respectfully dissent.

Under the Immigration and Nationality Act, an "applicant [like Mr. Martinez] bears the burden of proving refugee status" in establishing his eligibility for asylum. Diallo v. U.S. Att'y Gen., 596 F.3d 1329, 1332 (11th Cir. 2010) (per

curiam). A noncitizen makes the required showing by demonstrating that he is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1231 (11th Cir. 2007) (quoting 8 U.S.C. § 1101(a)(42)(A)). Thus, to show his eligibility for asylum, Mr. Martinez is required to give "specific and credible evidence" of "(1) past persecution on account of a statutorily listed factor, or (2) a 'well-founded fear' that the statutorily listed factor will cause such future persecution." Diallo, 596 F.3d at 1332.

I recognize that our Court sets a high bar for proving past persecution. This Court defines persecution as "an extreme concept that does not include every sort of treatment our society regards as offensive." Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000) (quotation marks omitted). Also in our Court, persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." Id. (quotation marks omitted). Mr. Martinez has met this standard. I think the mistake made by the majority is that its evaluation of Mr. Martinez's experience isolates each incident of harm against him, and thereby fails to appreciate the way he was forced to live in Cuba and the harm done to him in

22

the process. It's like studying each tree but ignoring the forest. In this way, the majority opinion fails to "evaluate the harms a petitioner suffered cumulatively," in the way our caselaw requires us to. Shi v. U.S. Att'y Gen., 707 F.3d 1231, 1235 (11th Cir. 2013).

To recap, Mr. Martinez testified that over the course of the two years after the government identified him as a dissident journalist he was: (1) Threatened by the head of the Committees for the Defense of the Revolution (CDR) in his hometown that if he continued writing for Convivencia he could "spend a lot of time in prison," "be tortured," and that the CDR could "do unimaginable things to [him]"; (2) Beaten unconscious by officers of the regime; (3) Arbitrarily seized from his home, detained overnight in bleak conditions, interrogated about his work with Convivencia and the magazine's plans for the future, and threatened that he "could be tortured," "jailed," or "they could make [him] disappear just like they did with other youth that did not share the same ideology that they had"; (4) Fired from three jobs in quick succession as a result of threats made by the government to those business owners; (5) Arrested and detained for three days and kicked out of town due to "political problems in [his] [home]town" when he attempted to relocate within Cuba; and (6) Prohibited from legally emigrating and stripped of his laptop and cell phone at the airport. And again, the Immigration Judge found

23

all Mr. Martinez's testimony about this to be believable, so here we must accept these happenings as true.

These acts against Mr. Martinez meet even this Court's demanding standard for persecution.  Far from random, isolated incidents, the mistreatment Mr. Martinez suffered at the hands of the government shows a two-year campaign of harassment and abuse—both physical and economic—as a direct result of his journalism that spoke out against the Cuban regime.  Once the Cuban officials identified Mr. Martinez as a dissident journalist, they not only threatened and assaulted him, but they made it nearly impossible for him to live his life.  He could not work and he could not relocate within the nation of Cuba, all while he was prevented from leaving.

Eleventh Circuit precedent establishes that this type of sustained campaign against a person is persecution.  In Delgado v. United States Attorney General, 487 F.3d 855 (11th Cir. 2007) (per curiam), this Court found that a father and son had been persecuted by supporters of Hugo Chavez when the two men received threatening phone calls, had unloaded guns pointed at them and the triggers pulled, the father twice had his car tampered with and defaced, and the son was beaten until he was nearly unconscious.  Id. at 859, 861.  As with the Delgado petitioners, Mr. Martinez also received threats (both before he was detained and while he was detained) and was physically beaten.  Although I don't enjoy comparing these

24

horribles, my understanding of the facts in the two cases is that Mr. Martinez's beating was worse than that suffered by the son in Delgado because Martinez was beaten until he was fully unconscious. And while Mr. Martinez never had an unloaded gun pointed at him with the trigger pulled, he endured other forms of persecution not present in the Delgado case. He was not allowed to keep steady employment, he was detained twice, and his travel was controlled by government officials. Given the scope and trajectory of the government's campaign against Mr. Martinez, I easily conclude that the facts of his case show past persecution supporting a grant of asylum.

The majority has concluded, to the contrary, that "[s]ubstantial evidence" supports the BIA's finding that Mr. Martinez's mistreatment did not rise to the level of persecution. See Maj. Op. at 14. I believe the only way the majority got to that conclusion is by improperly isolating the individual threats and instances of abuse that Mr. Martinez suffered. Indeed in the same way, the majority opinion relies on authorities that address persecution, but those cases address asylum seekers who did not experience the type of campaign Mr. Martinez experienced here. See id. at 14–16. And the majority opinion never analyzes Mr. Martinez's evidence cumulatively, such that it committed the same error as the BIA. For instance, the majority concludes:

25

- "[T]he BIA was entitled to find that the officer's threat that they could make Martinez 'disappear' during his first detention was menacing, but not persecution." Id. at 14.

- "[T]he evidence of Martinez's economic mistreatment does not compel a finding of persecution." Id. at 15.

- "[T]he fact that in April 2017 government officials stopped Martinez from flying to Guyana by briefly detaining him and seizing his laptop and cell phone is insufficient to compel a finding of persecution. While the government's actions were harassing, they do not compel a finding of persecution." Id. at 16.

Yet the idea that one (out of two) of Mr. Martinez's detentions, his economic mistreatment, and his harassment at the airport do not each individually rise to the level of persecution does not mean the Cuban government did not persecute Martinez. Our precedent is clear that "[i]n assessing past persecution we are required to consider the cumulative impact of the mistreatment the petitioner[] suffered." Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1258 (11th Cir. 2007). Here, Mr. Martinez's credible testimony is that within about a two-year period, he was beaten unconscious, threatened numerous times, detained twice, kicked out of town when he tried to relocate, fired from several jobs, and prevented from legally leaving the country—all because of his work as a journalist critical of the Cuban

26

government.  This repeated mistreatment, that followed Mr. Martinez to more than one job and more than one town, constitutes past persecution.

Beyond that, I don't view the individual incidents of mistreatment suffered by Mr. Martinez to be the kind of minor happenings the majority opinion makes them out to be.  Consider, for example, Mr. Martinez's February 2016 assault by plain-clothed officers.  While the majority acknowledges that the beating left Mr. Martinez "briefly unconscious," Maj. Op. at 12, it makes much of the fact that "his mother was able to treat the wound at home," id. at 13 n.5.  But I don't read this record to show that Mr. Martinez's wound, which left him bleeding from his head, was "minor."  His mother had 40 years of experience as a nurse.  That meant she was capable of stitching more serious wounds than the average mom.  And in any event, the level of stitching required does not change the fact that officers of the regime beat Mr. Martinez until he was unconscious.

The majority also minimizes Mr. Martinez's economic persecution.  Again in this regard the majority acknowledges the legal principle that the government persecutes someone when it denies them a means of earning a living.  See Maj. Op. at 15.  However the majority opinion fails to engage with what, precisely, happened to Mr. Martinez.  Of course the majority recounts the fact that Mr. Martinez was "fired from three jobs as a waiter after government officials threatened business owners."  Id. at 12.  Nevertheless, the majority concludes that

27

Mr. Martinez failed to show he could <u>not</u> earn a living because: "[t]he record established that Martinez was still writing for the magazine and that he had previous experience as a physical education teacher," and he "offered no evidence that he was unable to find work in his hometown in a different field or that he continued searching for a job after the two-month period between December 2016 and January 2017." <u>Id.</u> at 15.  Yet there is an utter lack of evidence in this record to show that Mr. Martinez could still earn a living off his writings for the magazine, or as a physical education teacher, or in any other field.  The record shows, to the contrary, that Mr. Martinez worked as a physical education teacher "way before" he began working as a waiter.  And there is no evidence that he would be able to find a job in that field now.  How is it proper to assume that the government's concerted campaign to keep Mr. Martinez from working as a waiter would somehow subside when he pursued other occupations?  Neither is the idea that Mr. Martinez could sustain a living off his writings for the magazine supported by the record.  Of course, it is Mr. Martinez's association with Convivencia that led to continuous threats and assault against him by the government in the first place.  We know that after his firings, Mr. Martinez tried to find different work in a new town, but that only resulted in another arrest, three days in jail, and having to

28

return home.[1]  See Arboleda v. U.S. Att'y Gen., 434 F.3d 1220, 1226 (11th Cir. 2006) (per curiam) (evidence compelled reversal of BIA's denial of asylum because noncitizen's "past experience supports the conclusion that relocation would not successfully shield him of persecution" and where BIA failed to consider whether internal relocation was "reasonable").

Finally, the Cuban government did more than "delay[] his travel" as the majority suggests.  Maj. Op. at 5.  The government barred Mr. Martinez from leaving Cuba through legal emigration processes.  He only escaped Cuba with the help of a passport control worker who aided him in leaving the country undetected.

Mr. Martinez's credible testimony shows two years of government threats, including a physical assault, that followed him from town-to-town, as he tried to avoid them, and left him unable to work or leave the country.  Our precedent does not require him to risk further injury or abuse to show that this constitutes persecution.

I respectfully dissent.

---

[1] The majority cites Zheng v. United States Attorney General, 451 F.3d 1287 (11th Cir. 2006) (per curiam) for its holding that an applicant's termination and inability to find work in his hometown did not compel a finding of past persecution.  See Maj. Op. at 15–16.  But Zheng is different because Mr. Zheng "was able to relocate to his parents' rural village and to live there for three years without being detained."  Zheng, 451 F.3d at 1291–92.  As we well know here, Mr. Martinez's efforts to relocate were met with his arrest and detention.