[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14061

_____

CARLOS ESCALONA-ESCALONA,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A213-448-837

_____

Before JILL PRYOR, GRANT, and MARCUS, Circuit Judges.

PER CURIAM:

Carlos Escalona-Escalona, a native and citizen of Cuba, entered the United States without having been admitted or paroled and without a valid entry document. Officers for the United States Border Patrol ("Border Patrol") encountered Escalona-Escalona near the United States-Mexico border, stopped him, searched him, and discovered his Cuban passport and Cuban identification card. The officers arrested Escalona-Escalona and took him to a processing center in Texas, where he admitted to being in the country without authorization. The Department of Homeland Security ("DHS") eventually transferred Escalona-Escalona to a detention facility in Georgia, where he was ordered to appear for removal proceedings.

Once removal proceedings began, Escalona-Escalona filed two motions. In his first motion, he moved to change venue to a detention facility in Florida, claiming that proceeding in Georgia would make it difficult for him to communicate with his lawyer and to call witnesses to testify. In his second motion, Escalona-Escalona moved to suppress the evidence DHS relied upon to establish that he was in the country without authorization—his Cuban passport, Cuban identification card, and admission made under arrest. Escalona-Escalona argued that Border Patrol officers violated his Fourth Amendment rights in stopping and searching him and that the exclusionary rule barred DHS's use of that evidence. Escalona-Escalona also applied for asylum, withholding of removal, and

relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT").

The Immigration Judge ("IJ") denied all the relief Escalona-Escalona sought: his motion to change venue, his motion to suppress, and his application for asylum, withholding of removal, and CAT relief. Escalona-Escalona appealed to the Board of Immigration Appeals ("BIA"). The BIA affirmed the IJ's decisions.

Now, Escalona-Escalona petitions this Court to review the BIA's final order. First, he argues that the BIA erred in affirming the IJ's denial of his motion to change venue. Second, he maintains that the BIA erred in affirming the IJ's denial of his motion to suppress. Third, he contends that the BIA erred in affirming the IJ's denial of his asylum, withholding-of-removal, and CAT claims. After thorough review and with the benefit of oral argument, we find no grounds for relief on any of the issues Escalona-Escalona raises. We therefore deny his petition.

## I.     BACKGROUND

We begin with the factual background, starting with the earliest episode of Escalona-Escalona's mistreatment at the hands of the Cuban government and ending with his encounter with Border Patrol in Texas. We then describe the procedural background—the relief Escalona-Escalona sought during his removal proceedings and the resolution of those issues in the immigration courts.

### A.      Factual Background[1]

Now 46 years of age, Escalona-Escalona began experiencing problems with the Cuban government when he was a college student. While in college, he was a member of a rock band that played songs with "social lyrics against the government." AR at 216.[2] "[M]any times," Cuban police would arrive at the concert venue, "push[] everyone," "ask[] everyone to leave," take the band's instruments, and "throw[] th[em] [on] the floor." *Id.* Escalona-Escalona was also asked to join the "Young Communist Union"—a student group affiliated with the Communist Party in Cuba—on multiple occasions, but he refused to do so. *Id.* at 210–11. He believes he lost out on "special benefits" because of his refusal to affiliate with the Communist Party while a student. *Id.* at 211.

After graduation from college, Escalona-Escalona found a job at a government-controlled bank in Cuba. He eventually rose to the position of "department manager." *Id.* at 224. While he worked at the bank, he refused to attend marches and parades associated with the Communist Party. After refusing to attend multiple marches and parades, he was transferred to another bank and demoted from his managerial position to the lowest position:

---

[1] For our factual background, we rely on Escalona-Escalona's testimony in his removal proceedings, testimony the IJ found credible.

[2] "AR" refers to the administrative record.

cashier. He believes he was demoted because he refused to attend the Communist Party's marches and parades.

Soon after his demotion, Escalona-Escalona began dating an American citizen. Representatives of the bank, who worked at the behest of the Cuban government, told him that he was "not allowed to have any kind of relationship with foreigners," including Americans who were considered "the number one enemy . . . of the government." *Id.* at 226. The bank representatives also noted that, by virtue of his work at the bank, he had "access to classified information." *Id.* The bank representatives expressed concerned that he was working as a spy on behalf of the United States.

But Escalona-Escalona did not end his romantic relationship. To the contrary, he tried to marry the American citizen he was dating, first in Cuba, and then in Mexico. The Cuban government would not recognize the marriage, however. When Escalona-Escalona traveled to Mexico to marry his fiancée there, he was denied entry into the country. He did not succeed in marrying, and he returned to Cuba after being denied entry into Mexico.

When he arrived back in Cuba, Cuban police came to his house, asking why he went to Mexico and inquiring about his relationship with the American citizen. He reacted to the police visit by "protest[ing] in front of everyone." *Id.* at 243. He told the Cuban police that he "didn't want to belong to the Communist Party" and that "the Communist Party [was] trying to . . . control" his "relationships, . . . work, [and] freedom." *Id.* From there, the police "dragged [him] out of the house" and took him to a police station.

*Id.* The Cuban police detained him for approximately "five hours" and hit him "about seven times" in the stomach with a baton. *Id.* at 546. He almost lost consciousness from the beating. He had "pain in [his] stomach for more than a week" and "had a hard time breathing." *Id.* But, after "us[ing] two days to recover," he went "back to . . . work like nothing had happened." *Id.* at 247.

The Cuban police soon returned to Escalona-Escalona's house and informed him that he would be forced to resign from the bank. Sure enough, when he went to work one day, he was presented with two letters: a resignation letter he had to sign, and a letter prohibiting him from working in any other Cuban financial institution in the future. He "protest[ed]" again, calling one of the bank officials a "puppet of the government." *Id.* at 248. The Cuban police were called to the bank, and Escalona-Escalona was arrested in front of his co-workers.

The Cuban police took him to a police station and placed him in a room with a "really low temperature." *Id.* at 249. He was detained "for 30 hours." *Id.* at 546. The police hit him with their fists and batons "13 to 15" times. *Id.* at 547. The police then "pour[ed] water on [him], and since it was really cold, [he] almost lost consciousness." *Id.* at 249. They told him that "if they saw [him] again doing the same kind of actions, they were going to disappear [him]." *Id.* at 249. As a result of the detention and beating, he suffered a dislocated shoulder and contracted pneumonia. He was able to recover from his injuries at home.

About a month later, Escalona-Escalona left Cuba. He traveled to Mexico and crossed into the United States via its southern border. Border Patrol officers encountered him near Hidalgo, Texas. He described his encounter with the Border Patrol in a sworn statement:

> They pulled up right in front of me and sh[ined] their lights on me. I put my hands up to show I was not dangerous because they had guns. I did not feel like I could leave. I don't think anything was said to me except "don't run." I was handcuffed and searched. They took the documents I had in my back pocket.

*Id*. at 461. In Escalona-Escalona's back pocket, the Border Patrol officers found his Cuban passport and identification card. He was then arrested and taken to a processing center in Texas.

At the processing center, he admitted to entering the United States without authorization. But he claimed in a sworn statement that he was fleeing persecution by the Cuban government. DHS then transferred him to North Carolina for a credible-fear interview. After the interview, DHS found that Escalona-Escalona had a credible fear of persecution in Cuba. He was then ordered to appear in Georgia for removal proceedings and transferred to a detention facility there.

## B.    Procedural Background

After being ordered to appear before the IJ in Georgia, Escalona-Escalona moved for relief. First, he filed a motion to change

the venue for his proceedings from Georgia to Florida, arguing that proceeding in Georgia would make it difficult for him to call witnesses and communicate with his lawyer. Second, he filed a motion to suppress the evidence DHS was relying upon to establish that he was in the United States unlawfully—his Cuban passport, Cuban identification card, and subsequent admission under arrest—arguing that the Border Patrol officers violated his Fourth Amendment rights and that the exclusionary rule barred use of that evidence. Third, he applied for asylum, withholding of removal, and CAT relief. He claimed that he suffered persecution in the past at the hands of Cuban authorities because of his anti-communist political beliefs and that, if he returned to Cuba, he would likely face persecution and torture in the future.

The IJ denied all relief. In denying, from the bench, the motion to change venue, the IJ said only that "if a respondent is here, then I'll handle his case. If he's not here, then I probably will not handle his case." *Id.* at 142. As for the motion to suppress, the IJ concluded that Escalona-Escalona failed to allege an "egregious" Fourth Amendment violation, barring application of the exclusionary rule. *Id.* at 63 (internal quotation marks omitted). As for the asylum, withholding-of-removal, and CAT claims, the IJ found that "[n]one of the harms or threats [Escalona-Escalona] sustained cumulatively r[o]se to the level of persecution." *Id.* at 70. In addition, the IJ found that he failed to show a well-founded fear of future persecution, noting, among other things, that Escalona-Escalona was released from police custody without charges; his family

remained unharmed in Cuba; and the Cuban government permitted him to travel outside of Cuba using his Cuban passport, belying the notion that the government wished to cause him further harm. The IJ denied his application for asylum, withholding of removal, and relief under the CAT.

Escalona-Escalona appealed to the BIA, which affirmed the IJ on all issues. The BIA affirmed the IJ's denial of the motion to change venue, observing that, even though the IJ did not enumerate reasons for denying the motion, Escalona-Escalona failed to show how he was prejudiced by the decision. As for the motion to suppress, the BIA agreed with the IJ that Escalona-Escalona failed to establish an egregious Fourth Amendment violation, so the exclusionary rule was inapplicable. And with respect to the application for asylum, withholding of removal, and CAT relief, the BIA agreed with the IJ that Escalona-Escalona failed to show past persecution, a well-founded fear of future persecution, or any other circumstances that could entitle him to relief.

Escalona-Escalona now petitions this Court for review of the BIA's final order.

## II.    LEGAL STANDARDS

We review only the BIA's decision, except to the extent the BIA's decision expressly adopts or agrees with the IJ's opinion. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947–48 (11th Cir. 2010).

"We review factual findings under the substantial evidence test and legal conclusions *de novo.*" *Jathursan v. U.S. Att'y Gen.*,

17 F.4th 1365, 1372 (11th Cir. 2021). "Under the substantial evidence test, we will not disturb an immigration judge's factual findings so long as they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (internal quotation marks omitted). "[T]he mere fact that the record may support a contrary conclusion is not enough to justify a reversal." *Martinez v. U.S. Att'y Gen.*, 992 F.3d 1283, 1290 (11th Cir. 2021) (internal quotation marks omitted). Instead, we ask whether the record "compels" another conclusion. *Id.* (internal quotation marks omitted).

"We review constitutional challenges, including alleged due process violations, *de novo.*" *Lapaix v. U.S. Att'y Gen.*, 605 F.3d 1138, 1143 (11th Cir. 2010).

## III.    DISCUSSION

We divide our discussion into three parts. First, we consider whether the BIA erred in affirming the IJ's denial of Escalona-Escalona's motion to change venue. Second, we consider whether the BIA erred in affirming the IJ's denial of Escalona-Escalona's motion to suppress. And third, we consider whether the BIA erred in affirming the IJ's denial of Escalona-Escalona's application for asylum, withholding of removal, and CAT relief.

## A.    Motion to Change Venue

Escalona-Escalona argues that the BIA erred in affirming the IJ's denial of his motion to change venue. The parties agree that Escalona-Escalona makes a procedural due process challenge with

this argument. Thus, we will consider, under a *de novo* standard of review, whether the IJ violated Escalona-Escalona's due process rights in denying his motion to change venue. *Lapaix*, 605 F.3d at 1143.

The thrust of Escalona-Escalona's argument is that the IJ failed to follow pertinent regulations and BIA precedent in denying his change-of-venue motion. An IJ may grant a motion for change of venue "for good cause." 8 C.F.R. § 1003.20(b). To determine whether good cause exists, immigration courts "usually consider[] . . . administrative convenience, expeditious treatment of the case, the location of the witnesses, and the costs of transporting witnesses or evidence to a new situs." *Matter of Velasquez*, 19 I. & N. Dec. 377, 382–83 (BIA 1986); *see also Matter of Rahman*, 20 I. & N. Dec. 480, 483 (BIA 1992) (enumerating the same factors).

We see no indication that the IJ considered any of these factors. In denying the motion, the IJ said only that "if a respondent is here, then I'll handle his case. If he's not here, then I probably will not handle his case." AR at 142. Notwithstanding the IJ's failure to consider the relevant factors under BIA precedent, the BIA affirmed the IJ's decision because Escalona-Escalona failed to explain how he was prejudiced by the denial of his motion to change venue.

We reach the same conclusion as the BIA, for the same reason. To be entitled to relief on this issue, Escalona-Escalona must demonstrate that his case was "substantially prejudiced" by the decision regarding venue. *Frech v. U.S. Att'y Gen.*, 491 F.3d 1277,

1281 (11th Cir. 2007). In *Frech*, for example, the petitioner filed two motions to change venue, arguing that he needed to be closer to his attorney and witnesses. *See id.* at 1279–80. The IJ denied both motions without mentioning "the factors he was required to balance under BIA precedent." *Id.* at 1279 n.3. We explained that although the IJ "failed to consider several relevant factors . . . before ruling on the motion[s]," the petitioner could not prevail without establishing that "he was prejudiced by the denial of the motion[s]." *Id.* at 1282 n.9. And because there was "no indication" that permitting the petitioner to be closer to witnesses or the counsel of his choice would have impacted the proceedings, we denied Frech's petition. *Id.* at 1282.

This case is like *Frech*. Escalona-Escalona has failed to articulate how he was prejudiced by the denial of the change-of-venue motion. In the motion, he argued that his ability to communicate with his attorney and to present witness testimony would be frustrated if his proceedings took place in Georgia. But the record demonstrates that Escalona-Escalona's attorney communicated with him remotely and that he had a witness available to testify at his hearing. Given that Escalona-Escalona's fears of proceeding in a Georgia venue were not realized, as in *Frech* there is no indication that he was "substantially prejudiced" by the denial of the motion to change venue. *Id.* at 1281. Therefore, he has not shown he is entitled to relief on this issue.

B.    Motion to Suppress

We next turn to Escalona-Escalona's argument that the BIA erred in affirming the IJ's denial of his motion to suppress. Escalona-Escalona argues that the Border Patrol officers who encountered him near the border violated his Fourth Amendment rights when they seized and searched him, discovering his Cuban passport and Cuban identification card. He maintains, therefore, that the exclusionary rule barred the DHS's use of his passport, identification card, and subsequent admission made under arrest that he was present in the United States without authorization.[3]

We have not addressed in a published opinion whether evidence obtained in violation of the Fourth Amendment must be excluded from removal proceedings. In *Immigration and Naturalization Service v. Lopez-Mendoza*, the Supreme Court held that the exclusionary rule generally does not apply to civil immigration proceedings. 468 U.S. 1032, 1034 (1984). Leaving the door ajar, however, a plurality of the Court observed that the "conclusion[] concerning the exclusionary rule's value might change" in the event of "egregious violations of [the] Fourth Amendment." *Id.* at 1050–51 (plurality opinion). In unpublished opinions, we have assumed, but not decided, that the exclusionary rule would apply in the event of an "egregious" violation of the Fourth Amendment. *See, e.g., Meza*

---

[3] Because the BIA explicitly adopted and agreed with the IJ's reasoning on this issue, we review both the BIA's and the IJ's decisions. *Ayala*, 605 F.3d at 947–48.

*v. U.S. Att'y Gen.*, 789 F. App'x 790, 796–97 (11th Cir. 2019); *Batres-Garay v. U.S. Att'y Gen.*, 748 F. App'x 204, 209–10 (11th Cir. 2018); *Rampasard v. U.S. Att'y Gen.*, 147 F. App'x 90, 92 (11th Cir. 2005). We take the same approach here.

Assuming the exclusionary rule would apply following an egregious Fourth-Amendment violation, we have no occasion to apply the rule here. The only evidence Escalona-Escalona points to in support of his motion is his affidavit, which describes his encounter with the Border Patrol officers. His affidavit says only that Border Patrol officers approached him in a vehicle, shined their lights on him, told him not to run, handcuffed him, and searched him. It lacks any details to distinguish the encounter from a routine border stop. Without more, Escalona-Escalona's argument regarding his motion to suppress does not persuade us he is entitled to relief on this issue.

## C.    Application for Asylum, Withholding of Removal, and CAT Relief

Finally, we consider Escalona-Escalona's argument that the BIA erred in affirming the IJ's denial of his application for asylum, withholding of removal, and relief under CAT. We first consider his asylum and withholding-of-removal claims. Then, we consider his CAT claim.

### 1.    *Asylum and Withholding of Removal*

We begin with Escalona-Escalona's asylum and withholding-of-removal claims. To qualify for asylum, a petitioner must

demonstrate either (1) past persecution on account of a statutorily protected ground or (2) a well-founded fear of future persecution on account of a statutorily protected ground. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006). We have applied the substantial evidence test in reviewing the BIA's conclusion on whether a petitioner suffered past persecution or has a well-founded fear of future persecution. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1353 (11th Cir. 2009) (applying the substantial-evidence test in reviewing past persecution); *Zheng v. U.S. Att'y Gen.*, 451 F.3d 1287, 1290–92 (11th Cir. 2006) (applying the substantial evidence test in reviewing well-founded fear of future persecution). If a petitioner fails to meet the requirements for asylum, the petitioner cannot meet the higher standard for withholding of removal. *See Jathursan*, 17 F.4th at 1373.

### i.    Past Persecution

We begin with Escalona-Escalona's argument that he suffered past persecution.[4] Persecution is an "extreme concept" that requires more than mere harassment or "a few isolated incidents of verbal harassment or intimidation." *Kazemzadeh*, 577 F.3d at 1353 (internal quotation marks omitted). We have said that "[m]inor physical abuse and brief detentions do not amount to persecution." *Id.*

---

[4] Here, too, the BIA explicitly adopted and agreed with the IJ's reasoning, so we review both the BIA's and the IJ's decisions on past persecution. *Ayala*, 605 F.3d at 947–48.

Escalona-Escalona suffered considerable mistreatment at the hands of Cuban police. He was detained and beaten on two occasions. During the first beating, the police hit him with their batons. He nearly lost consciousness and had trouble breathing for a week. The Cuban government then forced him to resign from his job, and when he protested in response, the police detained him a second time. During his second detention, the police held him in a cold room for 30 hours. They hit him with their fists and batons over a dozen times. They poured cold water on him. Escalona-Escalona nearly lost consciousness. The police threatened to make him "disappear" if he continued to speak out against the government. He suffered a dislocated shoulder and contracted pneumonia.

Reviewing all the evidence cumulatively, the BIA and IJ both concluded that Escalona-Escalona's mistreatment did not rise to the level of persecution. The BIA agreed with the IJ's findings that his injuries were not "serious or severe" because he recovered at home following both detentions. AR at 7, 69–70. The BIA also noted there was no indication Escalona-Escalona suffered "severe economic disadvantage" from the loss of his job. *Id.* And the IJ found that the threat to make him "disappear" was "not credible" because he was released from detention without charges. AR at 70.

Our substantial-evidence standard of review is highly deferential; we must construe all the evidence in favor of the BIA's decision and accept the findings of fact supporting it unless "the record compels a reversal." *Martinez*, 992 F.3d at 1290 (internal quotation

marks omitted). Given the IJ's factual findings that Escalona-Escalona's injuries were not serious or severe, that he suffered no severe economic disadvantage from the loss of his job, and that the threat to make him disappear was not credible—findings for which we cannot say that the record compelled a different conclusion—we must affirm the BIA's conclusion that what the Cuban police inflicted on him did not rise to the level of past persecution. See *id.* (finding the record did not compel a finding of past persecution when petitioner was beaten to the point of losing consciousness for a few minutes, detained for 20 hours on another occasion, fired from three restaurant jobs, and threatened with disappearance).

      ii.      Well-Founded Fear of Future Persecution

We turn next to Escalona-Escalona's argument that he had a well-founded fear of future persecution. To establish a well-founded fear of future persecution, the applicant must show a reasonable possibility that he will be singled out for persecution on account of a protected ground and that his fear is both (1) "subjectively genuine" and (2) "objectively reasonable." *Kazemzadeh*, 577 F.3d at 1352 (internal quotation marks omitted). The subjective component is usually satisfied by the petitioner's credible testimony that he fears persecution. *See De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1007 (11th Cir. 2008). There is no dispute that Escalona-Escalona has a subjectively genuine fear of persecution. But he must establish that his fear of persecution is objectively reasonable.

There are two alternative pathways for a petitioner to show his fear of persecution is objectively reasonable. First, a petitioner can point to "specific, detailed facts showing [that he has] a good reason to fear that he will be singled out for persecution on account of a statutorily protected ground." *Murugan v. U.S. Att'y Gen.*, 10 F.4th 1185, 1193 (11th Cir. 2021) (alteration adopted) (emphasis omitted) (internal quotation marks omitted). Or second, a petitioner may show "a pattern or practice" of persecution against a group of similarly situated persons. *Id.* We proceed by considering both pathways, asking whether the record compels a finding that Escalona-Escalona has an objectively reasonable fear of future persecution.

We start with the first pathway—whether there are specific detailed facts suggesting that Escalona-Escalona would be singled out for persecution upon his return to Cuba. On this point, the BIA observed that his problems with the Cuban police escalated after he started dating an American while working at a Cuban bank. The BIA reasoned that Escalona-Escalona's encounters with police were "motivated in large part" by his access to "banking secrets." AR at 7 (internal quotation marks omitted). The BIA determined that because he "no longer works for the bank, . . . there is no indication that the police has any continued, current[,] or future interest" in him. *Id.* at 8. And the IJ observed that Escalona-Escalona was released from custody without charges and that, after he lost his job, he was permitted to leave the country freely, belying any notion that the Cuban government was looking to harm him further.

20-14061                Opinion of the Court                19

In light of the evidence considered by the BIA and the IJ, we cannot say that the record compels a finding that Escalona-Escalona would be singled out for persecution upon his return to Cuba.

As to the second pathway—whether Escalona-Escalona showed a pattern or practice of persecution against similarly situated individuals—he asserts that he is similarly situated to other political dissidents in Cuba who have been persecuted by the Cuban government.[5] The IJ considered Escalona-Escalona's documentary evidence—the U.S. Department of State's 2019 Human Rights Report—and found that "[f]or private citizens such as [Escalona-Escalona] who oppose the Cuban government, the evidence indicates that they would experience harassment and short-term detentions that can last from a few hours to a few days." AR at 71. That evidence, the IJ concluded, did not indicate that there was a pattern or practice of conduct amounting to persecution against private citizens. The record does not compel another conclusion on Escalona-Escalona's pattern or practice theory.

In sum, Escalona-Escalona has failed to demonstrate that the record compels a finding of past persecution or a well-founded fear of future persecution. So he is not entitled to relief on his asylum claim. *Ruiz*, 440 F.3d at 1257. And because he has failed to demonstrate his entitlement to relief on his asylum claim, he likewise has failed to establish that he qualifies for withholding of removal. *See*

---

[5] On this argument, the BIA adopted the IJ's reasoning. We therefore review both the BIA's and the IJ's decisions. *Ayala*, 605 F.3d at 947–48.

*D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 819 (11th Cir. 2004) (holding that a petitioner unable to meet the standard of proof for asylum cannot meet the more stringent standard for withholding of removal).

### 2.    *CAT Claim*

Lastly, we consider Escalona-Escalona's CAT claim. To succeed, he must establish that, more likely than not, he would be tortured if removed to Cuba. *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242 (11th Cir. 2004). Torture is defined, in relevant part, as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him . . . for an act he . . . has committed or is suspected of having committed . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity . . . .

8 C.F.R. § 208.18(a)(1).

Most pertinently for this claim, Escalona-Escalona represents in his briefing that he was tortured when he was "waterboarded until he lost consciousness" in Cuba and that he is likely to suffer similar treatment in the future. Petitioner's Br. at 15–16. But the record does not support Escalona-Escalona's representation that he was waterboarded. Rather, the relevant testimony

indicates that cold water was "pour[ed]" on him. AR at 249. Failing to describe the evidence accurately, he cannot establish that the evidence compels a finding that he more likely than not would face torture in the future. He therefore cannot demonstrate that he is entitled to relief on his CAT claim.

## IV.    CONCLUSION

For the foregoing reasons, the petition is **DENIED**.