[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 19-13715

————————————————

Agency No. A216-265-732

SENTHOORAN MURUGAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

————————————————

Petition for Review of a Decision of the
Board of Immigration Appeals

————————————————

(August 24, 2021)

Before MARTIN, NEWSOM, and BRANCH, Circuit Judges.

BRANCH, Circuit Judge:

Senthooran Murugan petitions for review of a decision of the Board of Immigration Appeals (BIA), affirming the denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). In 2017, Murugan fled Sri Lanka and entered the United States without authorization. He claims that he suffered past persecution in Sri Lanka on account of an imputed political opinion and membership in the particular social group of Tamils, and that he would suffer future persecution and torture if returned to Sri Lanka. An immigration judge (IJ) found that Murugan could not establish that he suffered past persecution or that he would suffer future persecution on account of an imputed political opinion or membership in a particular social group and denied his application for asylum, withholding of removal, and CAT relief. The BIA affirmed that decision.

On appeal, Murugan contends that the BIA and the IJ committed various legal and factual errors in analyzing his claims. Because the agency applied the correct legal standards and its factual findings are supported by substantial evidence, and because Murugan failed to exhaust some of his arguments before the BIA, we dismiss in part and deny in part Murugan's petition for review.

## I.    Background

Murugan is a native and citizen of Sri Lanka and a member of the country's Tamil minority. In September 2017, he fled Sri Lanka and subsequently entered

the United States without authorization. Murugan claims that he left Sri Lanka because of three incidents involving the Sri Lankan Army.

The first incident occurred in February 2017. Murugan was arrested while returning home from work and questioned by Sri Lankan soldiers about what he was doing alone late at night, where he had come from, and where he was going. He was not harmed, but he was detained at an army camp and told that he would be released only if his parents came to pick him up. Murugan's parents came to pick him up the next morning, and he was released.

Then, in June 2017, Murugan was arrested, along with two others, while distributing humanitarian aid to refugees who had come to his village from Vanni, Sri Lanka.[1] He was brought to an army camp, tied to a chair, and interrogated for four days. The soldiers wanted to know whether Murugan had a prior connection to the refugees because the refugees came from a part of Sri Lanka that was under the control of the Liberation Tigers of Tamil Eelam (LTTE). Murugan denied having a prior connection to the refugees.

During the interrogation, Murugan was repeatedly slapped in the face and kicked in the thigh, and he later testified that he thought he was going to be killed. After four days of interrogation, Murugan's parents and neighbors secured his

---

[1] The refugees had been displaced by the Sri Lankan civil war, which was fought between the Sri Lankan government and the Liberation Tigers of Tamil Eelam. *See Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1283 (11th Cir. 2020).

release.  Before the army released Murugan, they warned him not to tell the media or any human rights organization about his mistreatment and that they would be monitoring him going forward.

After his release, Murugan was hospitalized for two days and received x-rays of his legs and arms, a blood test, and pain medication.  He also attended mental health counseling because he had stopped speaking or eating following his detention.  Murugan did not report his arrest to the police or any other government authority.

Finally, in August 2017, soldiers came to Murugan's home, arrested him, and brought him to an army camp.  There, they asked him why he had continued to help the Vanni refugees after he was warned not to do so during his previous arrest.  Murugan denied the accusation that he had continued to help the refugees, but the soldiers did not believe him and threatened to bring him to the "fourth floor"—an army torture camp for prisoners affiliated with the LTTE.

After six hours of detention, Murugan was released.  He testified that he was released because his parents had come to the camp and begged the army to release him.  After his release, Murugan's parents told him that his life was in danger and that the two people who had been arrested along with him back in June 2017 had been re-arrested and sent to the "fourth floor."  Murugan's parents sold land and family jewelry to get Murugan out of the country.  He left Sri Lanka on his own

4

passport, under his own name, in September 2017 and entered the United States in November 2017.

## II.    Procedural History

In December 2017, the government issued to Murugan a notice to appear, alleging that he was removable as "an alien present in the United States who ha[d] not been admitted or paroled."[2]  Murugan then applied for asylum, withholding of removal, and CAT relief.  He alleged past persecution and a well-founded fear of future persecution based on an imputed political opinion and membership in the particular social groups of Tamils and returned asylum seekers.[3]  He also later testified that if he returned to Sri Lanka, he feared he would be arrested at the airport and then tortured and killed.

---

[2]  We decline Judge Martin's invitation to use a term other than "alien" in this opinion. Rather, we use the term "alien" as it is the statutory term chosen by Congress.  *See Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 827 (1978) ("[A] statute is not an empty vessel into which this Court is free to pour a vintage that we think better suits present-day tastes." (quotation omitted)); *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) (en banc) ("[T]he role of the judicial branch is to apply statutory language, not to rewrite it."); *In re Davis*, 565 F.3d 810, 823 (11th Cir. 2009) ("Our function is to apply statutes . . . not to improve statutes by altering them." (quotation omitted)); *see also Abakporo v. U.S. Att'y Gen.*, No. 20-12750, 2021 WL 3598346, at *7 (11th Cir. Aug. 13, 2021) (Branch, J., concurring); *Davis v. Gregory*, No. 20-12716, 2021 WL 2944462, at *4 (11th Cir. July 14, 2021) (Branch, J., concurring); *Jean-Louis v. U.S. Att'y Gen.*, No. 20-12082, 2021 WL 2885838, at *2 (11th Cir. July 9, 2021) (Branch, J., concurring); *Rivera v. U.S. Att'y Gen.*, No. 20-13201, 2021 WL 2836460, at *7 (11th Cir. July 8, 2021) (Branch, J., concurring).

[3] Although Murugan also alleged persecution based on race, he did not provide evidence for that claim before the IJ.

After a removal hearing before an IJ on May 16, 2018, where Murugan conceded removability, the IJ issued a written decision denying Murugan's application for asylum, withholding of removal, and CAT relief. The IJ found that the harms Murugan suffered did not rise to the level of past persecution. He also found that Murugan failed to demonstrate a well-founded fear of future prosecution, noting that "[t]he record is devoid of evidence demonstrating that his fear of persecution would be objectively reasonable," or a pattern or practice of persecution of Tamils or returned asylum seekers in Sri Lanka. In particular, the IJ found that Murugan failed to "offer[] any evidence, other than his own testimony, that any individuals have indicated they would single him out and harm him upon returning to Sri Lanka," that "the record indicates that [Murugan's] family remains unharmed in Sri Lanka," and that the government had established that Murugan could "safely relocate within Sri Lanka and that it is reasonable to expect him to do so."

Moreover, the IJ further found that Murugan failed to establish that he was or would be persecuted on account of a statutorily protected ground. Specifically, Murugan failed to demonstrate a nexus between the alleged persecution and an imputed political opinion because he "provided no evidence, direct or circumstantial, that anyone imputed or would impute any political opinion to him." As to his membership in the particular social groups of Tamils and returned asylum

6

seekers, the IJ similarly found "insufficient evidence that [Murugan] faced persecution based on his Tamil ethnicity," and that the proposed group of returned asylum seekers was "overbroad and not socially distinct." Finally, the IJ rejected Murugan's application for withholding of removal and CAT relief because he failed to establish eligibility for asylum.

Murugan appealed the IJ's decision to the BIA. He argued that he provided sufficient evidence to show past persecution and that there was a pattern or practice of persecution of Tamils and returned asylum seekers in Sri Lanka. He also argued that he provided sufficient evidence to demonstrate a nexus between the alleged persecution and an imputed political opinion or membership in the particular social groups of Tamils and returned asylum seekers. Lastly, Murugan argued that he had provided sufficient evidence of a pattern or practice of persecuting Tamils and returned asylum seekers in Sri Lanka and argued that it would be unreasonable for him to relocate within Sri Lanka.

The BIA adopted and affirmed the IJ's decision. It concluded that "a single, brief detention and a longer 4-day detention during which [Murugan] was interrogated, slapped, and kicked—does not constitute persecution." It also concluded that the IJ did not clearly err in finding that Murugan failed to establish a well-founded fear of future persecution on account of a protected ground and that "[n]othing the Sri Lankan army said or did indicated any political or other

protected motive." Finally, the BIA agreed that Murugan failed to establish that there was a pattern or practice of persecution of Tamils in Sri Lanka and that the government had met its burden of demonstrating Murugan's ability to relocate safely. Because Murugan failed to establish his eligibility for asylum, the BIA concluded that he failed to establish eligibility for withholding of removal or CAT relief.

### III.    Standard of Review

"When the BIA issues its own decision, we review only that decision, except to the extent the BIA expressly adopts the IJ's opinion or reasoning." *Lopez v. U.S. Att'y Gen.*, 914 F.3d 1292, 1297 (11th Cir. 2019). We review the BIA's legal conclusions *de novo* and its factual findings for substantial evidence. *Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1286 (11th Cir. 2020). "[W]e must affirm the BIA's factual findings so long as they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id*. (quotation omitted). And we may reverse the BIA's factual findings only if the evidence compels that conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992); *see* 8 U.S.C. § 1252(b)(4)(B) (noting that the BIA's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary").

IV.    Analysis

To be eligible for asylum, Murugan was required to prove that he is a "refugee." 8 U.S.C. § 1158(b)(1)(B)(i). A refugee is a person who is "unable or unwilling" to return to his home country "because of [past] persecution or a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see Al Najjar v. Ashcroft*, 257 F.3d 1262, 1287 (11th Cir. 2001), *overruled on other grounds by Patel v. U.S. Att'y Gen.*, 971 F.3d 1258 (11th Cir. 2020) (en banc). We agree with the BIA that Murugan failed to establish past persecution or a well-founded fear of future persecution. But even if Murugan could establish past persecution or a well-founded fear of future persecution, he also failed to establish that the persecution was or would be on account of race, religion, nationality, membership in a particular social group, or political opinion.

A.    Past Persecution

Murugan argues that the BIA erred in concluding that he failed to demonstrate past persecution. "[P]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive." *Gonzalez v. Reno*, 212 F.3d 1338, 1355 (11th Cir. 2000) (quoting *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995)). In particular, "[m]inor physical abuse and brief detentions

9

do not amount to persecution." *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1353 (11th Cir. 2009).

Substantial evidence supports the IJ's conclusion that the harms Murugan suffered do not rise to the extreme level of persecution. Murugan was detained three times and, during the longer 4-day detention, was tied to a chair, slapped, and kicked. These harms, while serious, do not rise to the level of persecution. *See id.* (holding that an alien who was detained for four days and beaten and interrogated for five hours did not demonstrate past persecution); *Djonda v. U.S. Att'y Gen.*, 514 F.3d 1168, 1171, 1174 (11th Cir. 2008) (holding that an alien who was arrested, beaten, detained for 36 hours, hospitalized for two days, and threatened with re-arrest did not demonstrate past persecution).

Murugan separately argues that the BIA erred in its analysis of past persecution by failing to consider the mental harms he suffered from his detention and interrogation. But the IJ discussed Murugan's mental harms in his opinion, and substantial evidence supports the IJ's conclusion that the harms that Murugan suffered —both physical and mental—do not rise to the extreme level of persecution. Murugan offered little testimony as to his mental harms other than that he received counseling two or three times. He confirmed that he was not provided with any diagnosis related to the counseling and that he did not have any

problems presently other than "fear." Accordingly, Murugan failed to establish that he suffered past persecution.

B.    Future Persecution

Murugan next argues that the BIA erred in concluding that he failed to demonstrate a well-founded fear of future persecution. An alien who establishes past persecution is presumed to have a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). But absent a showing of past persecution, an alien must show that he has a "subjectively genuine and objectively reasonable" fear of future persecution if returned to his home country.[4] *Al Najjar*, 257 F.3d at 1289.

The objective prong can be satisfied with "specific, detailed facts showing [that the alien has] a good reason to fear that he . . . will be *singled out* for persecution" on account of a statutorily protected ground. *Id*. at 1290 (quotation omitted). An alien can also establish a well-founded fear of future persecution (and does not need to show an individualized risk of persecution) if he proves a pattern or practice of persecuting "a group of persons similarly situated to [himself]." 8 C.F.R. § 1208.13(b)(2)(iii). To prove the existence of a pattern or

---

[4] An alien does not have a well-founded fear of persecution if they "could avoid future persecution by relocating to another part of the . . . country . . . if under all the circumstances, it would be reasonable to expect [them] to do so." *Kazemzadeh*, 577 F.3d at 1352. Because we conclude that Murugan failed to demonstrate an objectively reasonable fear of future persecution, we do not address the BIA's determination that Murugan could relocate within Sri Lanka.

practice of persecution, the alien must prove that the mistreatment of persons similarly situated is "extreme and pervasive." *Lingeswaran*, 969 F.3d at 1291.

Substantial evidence supports the BIA's and the IJ's conclusions that Murugan failed to demonstrate a well-founded fear of future persecution. Murugan failed to establish an individualized risk of persecution because he failed to point to any evidence showing that he would be singled out for persecution if returned to Sri Lanka.

Murugan also failed to demonstrate a pattern or practice of persecution of persons similarly situated to himself. In *Lingeswaran*, we rejected a similar claim and held that "the mistreatment of Tamils in Sri Lanka is not so extreme and pervasive as to establish a pattern or practice of persecution." 969 F.3d at 1291. Here too, the record does not compel the conclusion that there is a pattern or practice of persecution of Tamils or returned asylum seekers in Sri Lanka.

The dissent contends that the IJ (and subsequently the BIA) "ignored" evidence that Murugan submitted related to the country conditions in Sri Lanka in late 2018 (the "2018 evidence"), after concluding that the materials Murugan submitted were "outdated." But this blanket assertion that the IJ ignored all of Murugan's supporting materials because they were outdated misrepresents the record. The IJ stated that "*some* of the country conditions evidence submitted by [Murugan] [were] outdated and therefore [did] not support [Murugan's] argument

12

that he will currently be subject to persecution in Sri Lanka." Plainly, by using the word "some," the IJ acknowledged that Murugan submitted other, more recent, evidence. And the IJ listed the 2018 evidence in the list of "documentary evidence" he considered. Further, the IJ stated that he had considered "the entire record carefully," and that "[a]ll evidence has been considered, even if not specifically discussed further in [the] decision." *See Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 803 (11th Cir. 2016) ("[W]hile the agency is required to consider all evidence that a petitioner has submitted, it need not address specifically each claim the petitioner made or each piece of evidence the petitioner presented." (quotation omitted)); *see also Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1376 (11th Cir. 2006) (explaining that an "[IJ] is not required to discuss every piece of evidence presented before him"). And the IJ cited on several occasions to Exhibit 8 in his analysis—as did the BIA—which was some of the 2018 evidence Murugan submitted. Thus, the record clearly establishes that the agency considered Murugan's 2018 evidence.

The 2018 evidence details how Sri Lanka's President Maithripala Sirisena suddenly fired the prime minister and appointed as the new prime minister former President Mahinda Rajapaksa—whose former presidency was marred by a series of human rights abuses and issues, many of which involved Tamils. The dissent relies on this 2018 evidence to conclude that the "record clearly contains sufficient

13

evidence of serious human rights abuses by the Sri Lankan government against Tamils" in support of Murugan's claim of a well-founded fear of future persecution. However, whether there was "sufficient evidence" to support Murugan's claim is not the applicable standard of review. Rather, we are limited to determining whether the agency's decision is supported by substantial evidence. *Lingeswaran*, 969 F.3d at 1286. Under the highly deferential substantial evidence standard, we review the evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision. *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1236 (11th Cir. 2006). Contrary to what one may discern upon reading the dissent, we cannot "reweigh the evidence from scratch." *Id.* (quotation omitted); *Al Najjar*, 257 F.3d at 1278 ("Courts of appeal sit as reviewing bodies to engage in highly deferential review of BIA and IJ determinations. Commensurate with this role, we cannot engage in fact-finding on appeal[.]" (internal citations omitted)). Thus, we will reverse findings of fact "only when the record compels a reversal." *Silva*, 448 F.3d at 1236 (quotation omitted); *see also Elias-Zacarias*, 502 U.S. at 481 n.1.

Importantly, even assuming arguendo that the record may support a contrary conclusion (as the dissent alleges), as we have said repeatedly, that fact alone "is not enough to justify a reversal of the administrative findings." *Silva*, 448 F.3d at 1236 (quoting *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004)). But to

14

be clear, the record does not support the position advanced by the dissent. The 2018 evidence—that the record establishes the IJ considered—at best establishes concern that, because Rajapaksa was appointed the new prime minister, abuses similar to those that occurred in the past against Tamils under Rajapaksa's presidency will occur again. Speculation that such abuses may occur again based on evidence of past "serious problems and abuses" does not satisfy Murugan's "very high burden of establishing a *current* pattern or practice of persecution."[5] (emphasis added). In other words, although Murugan provided evidence of "serious problems and abuses perpetrated by the Sri Lankan government" in the past, the record does not compel the conclusion that the agency erred in its findings.

C.    Nexus Requirement

Murugan also argues that the BIA erred in determining that he failed to demonstrate past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion (the "nexus requirement").[6]

---

[5] Murugan and the dissent also contend that the IJ applied the wrong legal standard to determine whether a pattern or practice of persecution of Tamils or returned asylum seekers exists in Sri Lanka. We lack jurisdiction to consider this argument because Murugan failed to exhaust it before the BIA. *See* 8 U.S.C. § 1252(d)(1); *see also Jeune*, 810 F.3d at 800; *Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006).

[6] Relatedly, Murugan contends that the BIA misinterpreted *Gaksakuman v. U.S. Att'y Gen.*, 767 F.3d 1164 (11th Cir. 2014), which Murugan maintains supports his argument that he

To be eligible for asylum, an alien must show a nexus between the alleged persecution and a protected status—"that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least o*ne central reason* for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added). To show a nexus, the alien must "present specific, detailed facts showing a good reason to fear that he . . . will be singled out for persecution on account of" the statutorily protected ground. *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation and emphasis omitted).

Murugan maintains that a "context sensitive" analysis "compels a conclusion that imputed political opinion was one of the central reasons for the harm to which

_____

would be imputed with a political opinion if returned to Sri Lanka. In *Gaksakuman*, we noted that the petitioner's "evidence tended to prove that any Sinhalese who sought asylum would be perceived as affiliated with the [LTTE] regardless of actual association." 767 F.3d at 1171 (emphasis added). Nevertheless, despite our statement as to what Gaksakuman's evidence "tended to prove," we remanded that case for further proceedings because the BIA failed to give "reasoned consideration" to Gaksakuman's application, and we could not review the evidence in the first instance to determine whether he was likely to suffer torture if returned to Sri Lanka. *Id.* Unlike in *Gaksakuman*, Murugan does not make any reasoned consideration argument here (nor could he do so legitimately because it is clear that the agency gave reasoned consideration to his application). Thus, any alleged misinterpretation of *Gaksakuman* is not relevant here because the issues on appeal in this case are different from those in *Gaksakuman*.

The dissent asserts that Murugan's brief assertion that the IJ "disregarded" his 2018 evidence "as too old" and erred "by failing to take into account probative evidence" is "enough under our precedent" to constitute a reasoned consideration argument. We disagree. As an initial matter, Murugan is represented by counsel, and therefore is not entitled to liberal construction of his brief. As such, the passing references in Murugan's counseled brief highlighted by the dissent, which are unaccompanied by any supporting legal analysis, are insufficient to raise a reasoned consideration argument. But even if he raised such an argument, as we explained previously, the agency gave reasoned consideration to his application.

16

[he] was subjected."[7]  But the record does not compel the conclusion that an imputed political opinion was or would be a central reason for Murugan's persecution.  Murugan asserted in his application for asylum and in his credible fear interview that, during his detention in Sri Lanka, the army officials had asked him about his connection with the LTTE and why he helped the refugees from Vanni.  But when Murugan's counsel asked Murugan at the merits hearing on his application whether the army questioned Murugan about whether he was involved in the LTTE, Murugan responded: "No, no, no, they were just suspecting and that they were saying that I had contact with these people during war time."  This testimony undercut his prior assertions.  And in light of Murugan's conflicting statements, we cannot say that the BIA lacked a substantial basis for its conclusion that Murugan's fear of persecution on account of the allegedly imputed political opinion was not well-founded.  *See Al Najjar*, 257 F.3d at 1290 ("The denial of asylum may be reversed *only* if the evidence presented by the applicant is so powerful that a reasonable factfinder would *have* to conclude that the requisite fear of persecution exists." (quotation omitted)).[8]

_____

[7] By "context-sensitive" analysis, Murugan simply means that "[w]hether or not something is political must be determined in the historical context of the country at issue."

[8] Murugan also argues that: (1) the IJ applied the wrong legal standard to its analysis of whether he demonstrated the required nexus between the alleged persecution and a statutorily protected ground; (2) the IJ erred in considering his family's continued safety in Sri Lanka because it was irrelevant to his well-founded fear of future persecution; and (3) the BIA failed to consider the intersection between his status as a putative failed asylum seeker and his past help to

* * *

Because the BIA did not err in its conclusions that Murugan failed to demonstrate past persecution, a well-founded fear of future persecution, or a nexus between the alleged persecution and a protected ground, it properly denied his claim for asylum. And because Murugan failed to demonstrate an entitlement to asylum, "he necessarily fail[ed] to establish eligibility for withholding of removal or protection under CAT." *Forgue*, 401 F.3d at 1288 n.4; *see Al Najjar*, 257 F.3d at 1292–93, 1303.

## V.    Conclusion

For these reasons, we dismiss in part and deny in part Murugan's petition for review.

**PETITION DISMISSED IN PART AND DENIED IN PART.**

---

the refugees from Vanni. We lack jurisdiction to consider these arguments because Murugan failed to exhaust them before the BIA. *See* 8 U.S.C. § 1252(d)(1); *see also Jeune*, 810 F.3d at 800; *Amaya-Artunduaga*, 463 F.3d at 1250.

MARTIN, Circuit Judge, dissenting:

The majority opinion gives no more consideration to Mr. Murugan's claims and individualized evidence than did the Board of Immigration Appeals and the Immigration Judge.  That is to say not much consideration at all.

Mr. Murugan produced evidence that in October 2018, the Sri Lankan government changed drastically when the former president, who had been accused of authorizing war crimes and other human rights abuses against Tamils "blindsided" political observers and "sudden[ly]" returned as prime minister.  Because Mr. Murugan is a member of the Tamil ethnic group, his attorney brought up these facts at the hearing before the IJ.  But the IJ took no notice of this evidence, finding that Mr. Murugan's country conditions evidence was outdated because it included materials related to the former president's rule from 2014 to 2016.  Mr. Murugan argued to the BIA that the IJ improperly disregarded these new facts, because they were relevant to what treatment the Tamils could expect from the newly returned prime minister.  Even so, the BIA mechanically adopted the IJ's decision that Mr. Murugan's evidence was outdated.  Mr. Murugan has now tried a third time, pointing out the significance of this evidence in his brief before this Court.

The majority opinion, like the IJ and the BIA, fails to engage with this evidence.  But I see it as substantial and highly probative evidence of a pattern or

19

practice of government persecution of Tamils. Because I believe Mr. Murugan met his burden of showing he had a well-founded fear of future persecution based on the Sri Lankan government's practice of persecuting Tamils, I would grant him relief on this claim.

## I.

Under Section 208(b) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(b)(1)(A), the Attorney General has the discretion to grant asylum to noncitizens[1] who are "refugee[s]" as defined in INA § 101(a)(42), 8 U.S.C. § 1101(a)(42)(A). INS v. Cardoza-Fonseca, 480 U.S. 421, 428 & n.5, 107 S. Ct. 1207, 1211 & n.5 (1987). The INA defines a "refugee" as a person unable to return to his or her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. (quoting 8 U.S.C. § 1101(a)(42)).

---

[1] The term "noncitizen" is the equivalent of the statutory term "alien." Nasrallah v. Barr, 590 U.S. __, 140 S. Ct. 1683, 1689 n.2 (2020); see also United States v. Estrada, 969 F.3d 1245, 1253 n.3 (11th Cir. 2020). "Alien" is increasingly recognized as an "archaic and dehumanizing" term. Maria Sacchetti, ICE, CBP to Stop Using 'Illegal Alien' and 'Assimilation' Under New Biden Administration Order, Wash. Post (Apr. 19, 2021), https://www.washingtonpost.com/immigration/illegal-alien-assimilation/2021/04/19/9a2f878e-9ebc-11eb-b7a8-014b14aeb9e4_story.html. Also the majority opinion could use the terms "petitioner," "asylum-seeker," or "applicant" where the term "alien" was used without sacrificing clarity or precision.

One way to establish asylum eligibility is for the applicant to put forward credible evidence that he has a well-founded fear of persecution in the future on account of his race, religion, nationality, membership in a particular social group, or political opinion.  Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1232 (11th Cir. 2007).  This well-founded fear of future persecution must be both "subjectively genuine and objectively reasonable."  Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1257 (11th Cir. 2006) (per curiam); see 8 C.F.R. § 208.13(b)(2)(i). "The subjective component can be proved by the applicant's credible testimony that he or she genuinely fears persecution, while the objective component can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution."  Ruiz, 440 F.3d at 1257 (quotation marks omitted).

However, "the applicant need not establish a reasonable possibility of persecution if the applicant instead proves that he is a member of, or is identified with, a group that is subject to a 'pattern or practice' of persecution in his country of nationality."  Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1352 (11th Cir. 2009); see 8 C.F.R. § 208.13(b)(2)(iii).  A noncitizen is deemed to have a well-founded fear of persecution and does not need to show an individualized risk of persecution if he establishes: (1) a pattern or practice of persecution of a group of similarly situated persons; and (2) his own inclusion in, and identification with, that group of persons such that his fear of persecution upon return is reasonable.  8

21

C.F.R. § 1208.13(b)(2)(iii).  "Pattern or practice" means "persecution of a group that is systemic, pervasive, or organized."  In re A-M-, 23 I. & N. Dec. 737, 741 (BIA 2005) (quotation marks omitted).

"An applicant does not have a well-founded fear of persecution if the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . if under all the circumstances it would be reasonable to expect the applicant to do so."  8 C.F.R. § 208.13(b)(2)(ii).  Generally, the applicant bears the burden of establishing that he would be unable to reasonably relocate within his country.  8 C.F.R. § 208.13(b)(3)(i).  But where, as here, the persecutor is the government or is government-sponsored, it is presumed that internal relocation is not reasonable.  8 C.F.R. § 208.13(b)(3)(ii).  In this circumstance, the government bears the burden of establishing by a preponderance of the evidence that it would be reasonable.  Id.

## II.

Since the majority opinion does not address it, I will briefly describe Sri Lanka's history of persecuting Tamils, as drawn from the evidence Mr. Murugan submitted.  Most Sri Lankans are ethnically Sinhalese.  For decades, the Sinhalese majority (which controlled the government) and the Tamil minority (through a group called the Liberation Tigers of Tamil Eelam ("LTTE")), waged a civil war.

22

The LTTE sought to establish an independent state for Tamils so they would be free from government discrimination.

In the years leading up to the end of the war, and for some time after, Sri Lanka was governed by President Mahinda Rajapaksa. Mr. Rajapaksa reportedly authorized war crimes and other human rights abuses against Tamils during his "strongman-style rule." Beyond these reported abuses, Mr. Rajapaksa was also accused of corruption and nepotism. His brother, Gotabaya, served as Defense Secretary and was also accused of authorizing war crimes and human rights abuses. Specifically, it is reported that Gotabaya oversaw the massacre of tens of thousands of Tamils in 2009. The governing Rajapaksa family was also accused of creating investigative agencies to exonerate themselves and others for their actions during the war.

Mr. Murugan submitted evidence of this history. For example, he submitted a 2015 Human Rights Report, in which the U.S. Department of State (the "State Department") observed that people reported "harassment of . . . persons viewed as sympathizers of the banned terrorist group the LTTE as well as arbitrary arrest and detention, torture, rape, and other forms of sexual and gender-based violence committed by police and security forces." Another report, titled "A Still Unfinished War: Sri Lanka's Survivors of Torture and Sexual Violence 2009–2015," said:

> Six years after the end of the war, the widespread and systematic nature of these attacks on Tamils . . . suspected of ties to the LTTE goes well beyond punishment or revenge.  These attacks speak of a government-supported effort to annihilate by any means the LTTE and subjugate the Tamil population that once supported them.

A Huffington Post article from 2016 described a "troubling" string of arrests of Tamils by the Sri Lankan government, made "under the guise of 'national security[.]'"  And the State Department recognized in its 2017 Human Rights Report that Tamil men reported that Sri Lanka's security forces tortured and sexually assaulted them.

Sri Lanka saw change in 2015 when Mr. Rajapaksa lost re-election and Maithripala Sirisena was elected president.  Mr. Sirisena promised accountability and reform.  There were still reports of persecution against Tamils, but it appeared that the government was working to improve.  People were hopeful.

Sadly, things took a dramatic turn for the worse on October 26, 2018.  Mr. Sirisena fired the prime minister and replaced him with Mr. Rajapaksa, who, again, was the former president responsible for the deaths and torture of tens of thousands of Tamils.  Many people warned that this was an unconstitutional coup, and complained that Mr. Sirisena's suspension of Parliament was done in an attempt to delay and "rally and strong-arm votes for Rajapaksa."  Mr. Murugan provided news reports that painted the situation as dire for Tamils:

24

## Sri Lanka's Tamils are at imminent risk after Rajapaksa's return

*Following the former president's return to power, international community needs to take urgent action to protect Tamils.*

## Dueling prime ministers and assassination plots: an escalating crisis in Sri Lanka

A constitutional crisis could spiral into violence.

## Sri Lanka: Warnings of 'bloodbath' as political tensions rise

*Sacked prime minister's party calls for protests as speaker warns of possible violence over parliament's suspension.*

His return to power, however, has worried human rights groups, who hold him responsible for alleged crimes committed by the military at the close of the country's 26-year-long civil war against Tamil separatists. The conflict ended in 2009.

Two days after the coup, the State Department issued a press statement calling on Mr. Sirisena to "immediately reconvene parliament and allow the democratically elected representatives of the Sri Lankan people . . . to affirm who will lead their government."

Mr. Murugan submitted evidence of this shift in government to the IJ about two weeks after it occurred. The IJ received it on November 14, 2018. Then, on November 28, Mr. Murugan testified at a hearing before the IJ. After he testified,

25

Mr. Murugan's counsel specifically argued that the evidence of Mr. Rajapaksa's takeover showed that Murugan has a well-founded fear of future persecution.

But the IJ ignored this evidence, calling the materials Mr. Murugan submitted "outdated." The IJ found that Mr. Murugan only submitted country conditions evidence from 2014 to 2016, and "did not submit any evidence showing that prior conditions persisted." Based on these findings, the IJ determined Mr. Murugan failed to show a pattern or practice of persecution of Tamils or returned asylum seekers in Sri Lanka. The BIA agreed, adopting the IJ's decision and acknowledging that the evidence "shows Tamils face hardships in Sri Lanka," but finding that Mr. Murugan did not show "a current pattern or practice of persecution against Tamils in Sri Lanka."[2]

But this record clearly contains sufficient evidence of serious human rights abuses by the Sri Lankan government against Tamils under Mr. Rajapaksa. The evidence that Mr. Rajapaksa has returned to power certainly provides sufficient evidence to support Mr. Murugan's claim that he will be persecuted because he is a

---

[2] The majority opinion says that, "on several occasions," the IJ and the BIA cited to Exhibit 8, which contained "some of the 2018 evidence" Mr. Murugan submitted. Maj. Op. at 13. Exhibit 8 is the State Department's 2017 Human Rights Report and a "Fact Sheet" from the spokesperson for the State Department. The majority opinion is correct in that the agency cited this exhibit. But the reason both the IJ and the BIA cited the exhibit is significant. Both acknowledged that the country conditions evidence "showed that Tamils have been subject to human rights abuses" in Sri Lanka. Without considering that evidence in conjunction with the evidence of Mr. Rajapaksa's return to power, the agency and the majority do not see the full picture of the risk Mr. Murugan faces should he return to Sri Lanka.

Tamil if he is returned to Sri Lanka.  At the very least, the IJ's and the BIA's decisions should be vacated because they lack reasoned consideration.  Mr. Murugan's case should be remanded to the agency for consideration of the totality of the evidence in the record.

## III.

A.    PATTERN OR PRACTICE OF PERSECUTION

The BIA acknowledged (as did the IJ) that the evidence shows Tamils face "hardships" in Sri Lanka, but said these hardships did "not meet the very high burden" of showing a "current" pattern or practice of persecution.  The BIA was referring to the IJ's finding that the evidence in the record reflected the timeframe from 2014 to 2016 and that Mr. Murugan "did not submit any evidence showing that prior conditions persisted."

The IJ's and the BIA's findings are not supported by the record.  Even before Mr. Rajapaksa returned to power, the State Department's 2017 Human Rights Report on Sri Lanka specifically found that "[g]overnment discrimination toward and security forces harassment of Tamils . . . persisted."  And it recognized that "torture is routine and continued throughout the country," noting people made nearly 300 allegations of torture by state actors as of September of that year.  The 2017 Report also recognized the Sri Lankan government's efforts to take steps to investigate, prosecute, and punish "some" officials who committed human rights

abuses, but these efforts quickly stalled. Seventeen months after Mr. Sirisena became president, no one had been convicted.

Mr. Murugan provided even more recent evidence showing that, after Mr. Rajapaksa was named prime minister in October 2018, Tamils "are at imminent risk." In addition, political observers expect Mr. Rajapaksa's brother Gotabaya, who ordered the mass murder of Tamils, to return to a position within Rajapaksa's government. Another article, dated October 30, 2018, shed light on the fears of Sri Lankan activists that Mr. Rajapaksa's return to power would end any human rights investigations implemented by the previous prime minister.

The timing of the political struggle over Sri Lanka's prime ministership is especially relevant. Mr. Rajapaksa replaced the former prime minister on October 26, 2018. Two days later, the State Department acknowledged the impropriety of this coup. On November 12, Mr. Murugan submitted evidence of the recent developments in Sri Lanka, including news articles published from October 28 to November 2. This evidence was filed with the IJ on November 14. The hearing before the IJ, during which Mr. Murugan's counsel argued the evidence of Mr. Rajapaksa's takeover establishes a well-founded fear of future persecution, was held on November 28. Then, on December 19, the IJ issued its decision.

But that decision—and the BIA's adoption of it—was not supported by substantial evidence. Substantial evidence is "such relevant evidence as a

28

reasonable person would accept as adequate to support a conclusion." Todorovic v. U.S. Att'y Gen., 621 F.3d 1318, 1323–24 (11th Cir. 2010) (quotation marks omitted). Contrary to the agency's findings, Mr. Murugan did submit evidence relevant to whether Tamils were suffering persecution at the hands of the government, for the time period as close as a month before the IJ's decision (and two weeks before the November 28 hearing before the IJ). This evidence contradicts the findings that conditions in Sri Lanka improved after the civil war, and compels a finding contrary to the one the agency reached. This requires reversal.[3] See Bigler v. U.S. Att'y Gen., 451 F.3d 728, 732 (11th Cir. 2006) (per curiam) (holding that the substantial evidence test "requires reversal of factual findings" if the evidence "compels a contrary conclusion").

In addition to failing to analyze the evidence offered by Mr. Murugan, the majority also mistakenly compares Mr. Murugan's pattern-or-practice claim to the one in Lingeswaran v. U.S. Attorney General, 969 F.3d 1278 (11th Cir. 2020). See Maj. Op. at 12–13. Mr. Lingeswaran also sought asylum on the grounds that he

---

[3] Also notable, the IJ seemed to apply the wrong standard in its pattern-or-practice analysis. The IJ said that Mr. Murugan submitted evidence only of "a pattern of human rights violations in general, without sufficiently showing Respondent is in danger of being persecuted upon his return." But this is not the proper analysis for a pattern-or-practice claim. Pattern-or-practice evidence is not individualized—it is based on an individual's membership in a specific group. See 8 C.F.R. § 1208.13(b)(2)(iii); In re A-M-, 23 I. & N. Dec. at 741 ("Pattern or practice" means "persecution of a group[.]"). No one disputes that Mr. Murugan is Tamil. And much of Mr. Murugan's evidence refers to the harms Tamils have suffered at the hands of the government.

would suffer persecution if removed to Sri Lanka because he was Tamil.  See

Lingeswaran, 969 F.3d at 1283–85.  But the majority relies on the facts of Mr.

Lingeswaran's case, which showed "the Sri Lankan government has made

recognized efforts to improve the situation for Tamils and reconcile the country"

following the civil war.  Id. at 1291.  The majority thus relies on the facts from the

Lingeswaran opinion to bolster its conclusion that the record Mr. Murugan

submitted does not compel a conclusion that there is a pattern or practice of

persecution of Tamils.  There are two problems with this.  First, the facts of

Lingeswaran are demonstrably different from Mr. Murugan's case.  Mr.

Lingeswaran submitted his application for asylum in May 2017, and the BIA

reached its final decision on July 25, 2018.  This was months before Mr. Rajapaksa

returned to Sri Lanka's government as prime minister.

Second, and, fundamentally, the evidence relevant to a particular asylum

eligibility determination is that specific evidence provided by the applicant, and it

must be evaluated in each individual case.  See Sanchez Jimenez, 492 F.3d at 1232

("[A]n applicant can prove refugee status by presenting specific and credible

evidence of . . . fear of future persecution[.]" (quotation marks omitted) (emphasis

added)); Indrawati v. U.S. Att'y Gen., 779 F.3d 1284, 1302 (11th Cir. 2015)

(("[T]he IJ and the BIA must consider all the evidence submitted[.]").  So it is the

30

evidence submitted by Mr. Murugan—not the evidence Mr. Lingeswaran presented to meet his burden—that matters here.

The evidence Mr. Murugan submitted compels me to conclude that he has a well-founded fear of future persecution. I would grant Mr. Murugan's petition because he has established he has a well-founded fear of future persecution based on the government's pattern or practice of persecuting Tamils.

## B.    RELOCATION

The majority opinion did not address the BIA's determination that Mr. Murugan could relocate within Sri Lanka because its holding that he could not demonstrate an objectively reasonable fear of future persecution rendered review of the relocation issue unnecessary. Maj. Op. at 11 n.4. Because I think the majority opinion should have included a ruling on this issue, I will address the relocation finding here.

The IJ found, and the BIA agreed, that the government met its burden to show that it was reasonable for Mr. Murugan to relocate within Sri Lanka. The IJ found the record "does not demonstrate that there would be unreasonable social or cultural constraints, or other practical barriers." The BIA affirmed, adding that the evidence Mr. Murugan relied on "is nearly 4 years old" and he "does not cite any recent country conditions evidence that would convince us otherwise." Essentially, the BIA found that Mr. Murugan could reasonably relocate for the

same reason it found he was not eligible for asylum: its conclusion that Mr. Murugan did not submit evidence that Tamils face a present danger of persecution in Sri Lanka.

But as explained above, this patently misstates the record.  Mr. Murugan provided over 230 pages of country conditions evidence, some as recent as November 2018.  The agency disregarded this evidence when reaching its conclusion that Mr. Murugan could reasonably relocate within Sri Lanka.  Contrary to the government's argument, this evidence does compel the opposite conclusion.  I would direct the BIA to reconsider this finding on remand as well.

**III.**

At the very least, the agency did not give reasoned consideration to Mr. Murugan's future-persecution claim, including whether he can reasonably relocate within Sri Lanka.[4]  It is this Court's job to find a lack of reasoned consideration when, among other things, the BIA misstates the contents of the record or

---

[4] When discussing a different argument Mr. Murugan made, about his eligibility for asylum based on a political opinion imputed to him, the majority opinion says that Murugan "does not make any reasoned consideration argument here." Maj. Op. at 15 n.6.  But he has.  In a discrete section of his opening brief, Mr. Murugan argued that the BIA "disregarded" and "fail[ed] to take into account" the 2017 and 2018 evidence he presented, and cited that specific evidence.  That is enough under our precedent.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681–82 (11th Cir. 2014).  Further, Mr. Murugan made the same argument to the BIA.  This information provided in his argument was sufficient to enable the BIA to review and correct the IJ's error, and the fact that he did not use the term "reasoned consideration" is not fatal to his claim.  See Indrawati, 779 F.3d at 1297.  Mr. Murugan has done all he needs to do to raise a reasoned consideration argument and the majority opinion's rebuff of any reasoned consideration claim is misinformed.

"provides justifications for its decision which are unreasonable and which do not respond to any arguments in the record."  See Martinez v. U.S. Att'y Gen., 992 F.3d 1283, 1294 (11th Cir. 2021) (quotation marks omitted).  The agency finding that Mr. Murugan did not present any evidence beyond 2016 "showing that prior conditions persisted" to show a pattern of persecution of Tamils both misstates the record and justifies its decision in ways that fail to respond to Mr. Murugan's arguments.  The agency misstated the contents of the record because Mr. Murugan submitted evidence from 2017 and 2018—some as recent as a month before the IJ's decision.  And the agency provided unreasonable justifications for its decision that completely failed to respond to the arguments Mr. Murugan made about the recent developments in Sri Lanka.  See id.  Based on our precedent, I would hold that the agency failed to give reasoned consideration to Mr. Murugan's claims.  As a result, I would grant his petition for review, vacate the BIA's decision, and remand for further proceedings.  Id.

*       *       *

When this Court is tasked with reviewing a decision of the BIA, we must actually review it, albeit with deference.  This majority opinion may condemn Mr. Murugan to extreme persecution in Sri Lanka because it failed to actually examine the evidence of recent political changes in that country.  When a dictator with a well-documented history of persecuting an ethnic group returns to power, surely

33

our law does not require a member of that group wait to again experience persecution before he can claim asylum.  Mr. Murugan has met his burden here.  I respectfully dissent.