[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-13630

Non-Argument Calendar

_____

ERICK JHONY RODRIGUEZ,

                                                            Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

                                                            Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A206-772-903

_____

Before JORDAN, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Erick Jhony Rodriguez petitions for review of the board of immigration appeals's order affirming the immigration judge's denial of his claims for asylum, withholding of removal, and relief under Convention Against Torture.  Because the board correctly concluded that Rodriguez's asserted particular social group was not cognizable, and because substantial evidence supported the board's finding that Rodriguez would not be tortured if he was returned to Nicaragua, we deny the petition.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Rodriguez, a native and citizen of Nicaragua, entered the United States in June 2014 as a fourteen-year-old noncitizen.  The Department of Homeland Security issued a notice to appear, charging Rodriguez as removable because he lacked valid entry documents.  Through counsel, Rodriguez admitted removability as charged.  And he applied for asylum, withholding of removal, and Convention relief based on gang violence in Nicaragua.

In his initial application, Rodriguez detailed his experience with gang violence in Nicaragua, explaining that gang members "would . . . wait for us after school," "[p]eople would hurt each other all the time and the police did nothing," and his "family would not let [him] go out because they feared something would happen to" him.  Rodriguez explained he feared harm or

mistreatment if he returned to Nicaragua because many of his friends "were forced into" the gangs "and to do the bad things they did," and he "would be targeted and forced into a life [he] d[id]n't want" or else "they would kill [him] or harm or kill people in [his] family." Rodriguez also submitted several supporting documents, including country reports and articles on gang violence in Nicaragua.

At a merits hearing before the immigration judge, Rodriguez testified that he was seeking asylum "to protect [his] life." Rodriguez explained that when he was younger "the gangs were intimidating [him]" in Nicaragua. At the time, Rodriguez lived with his aunt and uncle because his mother had moved from Nicaragua to the United States. Rodriguez testified that a gang called "Los Chocoyos" started in his neighborhood when he was eleven, and the gang wanted to "introduce young people like [him]" to join. To get to school or to shop, Rodriguez had to pass the area where the gang lived. Gang members threatened him and other children, claiming the gang would attack the kids or their families if the kids would not join the gang. While Rodriguez and the other kids played baseball, gang members "intimate[d]" them and "sa[id] that if [the kids] didn't join them, [then] they would hit [the kids] with the bats or they would stab [them] or . . . attack [their] families." At age eleven, gang members "grab[bed] [Rodriguez] from [his] arm and pull[ed]" it while he was playing. The gang also mugged Rodriguez's uncle as he shopped but the uncle "refused to give them what" he had. After his uncle's mugging, Rodriguez fled to the United States; the first time he attempted to do so, he was

detained in Mexico and sent back to Nicaragua, before eventually making it here.

Rodriguez believed that if he were to return to Nicaragua his "life [would be] in danger because of all the gangs that exist[] in [his] city" and because people there knew he'd come to the United States, so if he were to "return, [then he believes] they will think that [he has] money." Rodriguez did not think he could move safely to another city because gangs exist throughout the country. When asked why the gang had threatened him, he said it was because he was "very small" and "a child," and he feared torture if he returned to Nicaragua "because of the threats that were made to [him] when [he] was a child."

Rodriguez also testified about the police response to the gang activity. Police would "sometimes detain" the gang members and "jail them," but "then they would let them go." According to Rodriguez, the police wouldn't do this "[t]o try to protect [the kids] because [they] were children," but the police would intervene "when the[ gang members] were trying to steal . . . [or] to attack someone." Rodriguez explained that the "police almost never would attend to" calls about "intimidating the children . . . because they don't think . . . that's important." When asked if he was "afraid that [he] might be tortured by the police or some government official," Rodriguez responded, "No."

The immigration judge denied Rodriguez's application for asylum, withholding of removal, and Convention relief. The immigration judge found that Rodriguez was a "credible witness."

But even though the immigration judge credited Rodriguez's testimony about gang recruitment and violence, she explained that neither being a victim of gang violence nor resisting gang recruitment was a cognizable particular social group. Because Rodriguez had not shown persecution or fear of persecution based on a cognizable ground, he did not qualify for asylum. And because Rodriguez failed to meet his asylum burden, the immigration judge concluded he also failed to meet the higher burden for withholding of removal. Finally, the immigration judge rejected the Convention relief claim because she found that Rodriguez "ha[d] failed to establish" that a Nicaraguan official would torture him or that the government would acquiesce to torture.

Rodriguez appealed the immigration judge's decision to the board, but the board dismissed the appeal and "adopt[ed] and affirm[ed] the decision of the [i]mmigration [j]udge." The board explained that "individuals who are targeted for recruitment by a gang are not generally recognized to be members of a cognizable particular social group for purposes of asylum and withholding of removal" and that such recruitment, "absent evidence of a nexus to a protected ground, is insufficient in itself to establish eligibility for asylum." The board also concluded that, although Rodriguez "believes he would be targeted if he returned to Nicaragua because individuals would believe he has money after" living in the United States, "the perception of wealth is not a basis for a cognizable social group or a protected ground for asylum or withholding of removal." Because Rodriguez "ha[d] not established eligibility for asylum," the board concluded "he necessarily ha[d] not met the

burden of proof for withholding of removal." Finally, the board "also affirm[ed] the [i]mmigration [j]udge's conclusion that [Rodriguez] ha[d] not established eligibility for" Convention relief "because he did not demonstrate that he is more likely than not to be tortured in Nicaragua, by or with the acquiescence . . . of a government official" if he were to return.

## STANDARD OF REVIEW

Where, as here, "the [board] issues its own decision, we review only that decision, except to the extent the [board] expressly adopts the [immigration judge]'s opinion or reasoning." *Murugan v. U.S. Att'y Gen.*, 10 F.4th 1185, 1192 (11th Cir. 2021) (citation omitted). We review legal conclusions de novo, and we review findings of fact for substantial evidence. *Id.* That means we reverse findings of fact only where "any reasonable adjudicator would be compelled to conclude to the contrary." *Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1286 (11th Cir. 2020) (quoting 8 U.S.C. § 1252(b)(4)(B)). The cognizability of a proposed particular social group is a legal issue subject to de novo review. *See Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019).

## DISCUSSION

Rodriguez seeks review of the denial of his claims for asylum, withholding of removal, and relief under the Convention. First, we'll consider his asylum and withholding of removal claims together, and then we'll address his claim under the Convention.

*Asylum and Withholding of Removal Claims*

We start with Rodriguez's asylum and withholding of removal claims. A noncitizen may be granted asylum if he qualifies as a "refugee," which includes a person "who is unable or unwilling to return to" their country of nationality "because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group." 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A). For withholding of removal, a noncitizen is eligible for relief if he can demonstrate he more likely than not will be persecuted based on his membership in a particular social group upon his return to his country. *See id.* § 1231(b)(3).

In denying asylum and withholding of removal, the board explained that Rodriguez failed to raise a cognizable particular social group. To be cognizable, a particular social group must be "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014); *accord Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 404 (11th Cir. 2016) (setting out the same BIA standard for particular social groups). Immutability refers to a characteristic that is "immutable or fundamental to a member's individual conscience or identity." *Amezcua-Preciado v. U.S. Att'y Gen.*, 943 F.3d 1337, 1342 (11th Cir. 2019). Particularity refers to the requirement that the particular social group must "be discrete and have definable boundaries—it must not be amorphous, overbroad, diffuse, or subjective." *Gonzalez*, 820 F.3d at 404 (quoting *Matter of W-G-R-*, 26 I. &

N. Dec. 208, 214 (BIA 2014)). And social distinction "refers to recognition by society"; "[t]o be socially distinct[], a group need not be *seen* by society[, but] it must instead be *perceived* as a group by society." *Matter of W-G-R-*, 26 I. & N. Dec. at 216 (citation omitted). In other words, for there to be social distinction, "there must be evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group." *Id.* at 217.

In this case, the proposed particular social group is "Nicaraguan children opposing gang recruitment." Rodriguez argues that the board erred in concluding that the proposed particular social group was not cognizable. But we agree with the board that his particular social group is not cognizable because it lacks social distinction.

The board's past decisions in this area are instructive. Social distinction involves the perception of the group in "the relevant society," so it "may . . . not be determined solely by the perception of an applicant's persecutors." *Matter of W-G-R-*, 26 I. & N. Dec. at 218. Take *Matter of S-E-G-*, for example, where the board concluded that a particular social group of Salvadoran "youths who have resisted gang recruitment, or family members of such Salvadoran youth," did not have social visibility. 24 I. & N. Dec. 579, 582, 588 (BIA 2008); *see also M-E-V-G-*, 26 I. & N. Dec. at 249–51 (relying on *Matter of S-E-G-* in explaining the standard for assessing a particular social group's social distinction). In that case, "[t]here [wa]s little background evidence of record to indicate" that the Salvadoran

youths who rejected recruitment "would be 'perceived as a group' by society, or that th[o]se individuals suffer[ed] from a higher incidence of crime than the rest of the population." *Matter of S-E-G-*, 24 I. & N. Dec. at 587. Although the case involved "sympathetic personal circumstances," the board concluded there was "no persuasive evidence" for the group to qualify as a particular social group. *Id.* at 588.

Here, too, there is no evidence that the asserted particular social group of "Nicaraguan children opposing gang recruitment" had the necessary social distinction to be cognizable. The supporting articles and reports in the record do not "suggest[] that the particular social group [Rodriguez] had proffered was perceived as being socially distinct in" Nicaragua. *See Perez-Zenteno*, 913 F.3d at 1309.

Rodriguez points to his testimony that the gang's recruitment efforts targeted children, including when they were playing sports. Various parents and Rodriguez complained to teachers at the school about the gang problems the children faced. And one of the articles that Rodriguez submitted referred to a mother encouraging police to incarcerate the gang so as "to avoid bloodshed among young people." But none of that evidence shows that "Nicaraguan children opposing gang recruitment" is a socially distinct group. It just shows who the gang's primary target is, not that society as a whole would perceive that targeted audience—the proposed particular social group here—as a distinct group. *See Matter of W-G-R-*, 26 I. & N. Dec. at 218.

In any event, the same evidence Rodriguez points to also shows the gang attacks adults. Rodriguez testified that the gang attacked his uncle, and the article that he cites referenced the gang's "misdeeds against defenseless people" and a mom who "fear[ed]" returning home "because she [might] be exterminated by those fearsome" gang members. So, to the extent the gang's targeting practices are relevant, they don't show social distinction either. In short, even the evidence of the gang's victims doesn't show any social distinction for the Nicaraguan children who oppose the gang.

Because the proposed particular social group lacks social distinction, the board did not err in denying the asylum claim for failure to put forth a cognizable particular social group. *See Perez-Zenteno*, 913 F.3d at 1307–08. For the same reason, it also did not err in denying the withholding of removal claim. *See Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1352 (11th Cir. 2009).

*Convention Against Torture Claim*

We now turn to Rodriguez's Convention claim. To be eligible for relief under the Convention, Rodriguez needed to show it is more likely than not that he would be tortured if removed to Nicaragua. *See* 8 C.F.R. § 208.16(c)(2). "Torture," under the Convention, is "inflicted by or at the instigation of or with the consent or acquiescence of a public official" or another person "acting in an official capacity." *Id.* § 208.18(a)(1). "Acquiescence . . . requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity.'"

*Id.* § 208.18(a)(7).  Here, "[t]he record does not compel a finding of torture by, or at the acquiescence of, the [Nicaraguan] government." *Lingeswaran*, 969 F.3d at 1293–94.

In his brief, Rodriguez explains how he "fears that [the gang] will kill him and that the Nicaraguan government will not protect him."  And the gang had physically "grab[bed]" his arm and "pull[ed]" it, threatened him and other children and their families, and attacked his uncle.  But that on its own isn't enough for Convention relief.  Rodriguez still had to prove that he would suffer torture by or with the acquiescence of the Nicaraguan government.

Rodriguez's evidence doesn't compel such a finding.  Rodriguez points to his testimony that the police didn't take cases involving kids seriously and that the situation was so bad that the parents even turned to the school for help because "the police wouldn't be interested in them."  But Rodriguez also testified that "[t]he police would sometimes detain" gang members, "jail them, and then . . . let them go."  He admitted that the chief of police in 2009 had recognized there was a problem with the gang and had taken action about it.  That same governmental response is reflected, too, in the article on the gang that Rodriguez submitted, which details how the chief of police said several gang members "ha[d] 50 cases pending with the justice, so he will take action on the matter."  Rodriguez even conceded that "many of them were jailed."  To be sure, Rodriguez submitted evidence detailing general violence and governmental corruption in Nicaragua.  But he also testified that

"[e]very time" the gang "assaulted" or "mugged" someone, "they would be detained."

Read as a whole, the record does not compel a different finding from the one the board and the immigration judge made that Rodriguez would not be tortured by, or with the acquiescence of, the government. *See Lingeswaran*, 969 F.3d at 1286. Substantial evidence supported the board's decision to affirm the denial of his Convention relief claim.

**PETITION DENIED**.